# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| ASHLEY BRADY and STEPHANIE DALLI CARDILLO, on behalf of themselves and all others similarly situated,<br><br>          Plaintiffs,<br>     v.<br><br>BASIC RESEARCH, L.L.C., ZOLLER LABORATORIES, L.L.C., NICOLE E. POLIZI a/k/a SNOOKI, DENNIS W. GAY, DANIEL B. MOWREY, and MITCHELL K. FRIEDLANDER,<br><br>          Defendants. | Case No. 2:13-CV-07169-SJF-ARL<br><br>**FIRST AMENDED CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

**TABLE OF CONTENTS**

NATURE OF THE ACTION ................................................................................................. 1

PARTIES ............................................................................................................................... 3

    A.   Plaintiff Ashley Brady ........................................................................................ 3

    B.   Plaintiff Stephanie Dalli Cardillo .................................................................... 4

    C.   Defendant Basic Research, L.L.C. .................................................................. 5

    D.   Defendant Zoller Laboratories, L.L.C. .......................................................... 7

    E.   Defendant Dennis W. Gay .............................................................................. 7

    F.   Defendant Daniel B. Mowrey .......................................................................... 8

    G.   Defendant Mitchell K. Friedlander ................................................................. 9

    H.   Defendant Nicole E. Polizzi a/k/a Snooki ..................................................... 11

JURISDICTION AND VENUE ......................................................................................... 12

FACTS COMMON TO ALL CAUSES OF ACTION ....................................................... 12

    A.   Defendants' History ........................................................................................ 13

    B.   Defendants' Pattern and Practice of Illegal Marketing and Advertising .......... 14

    C.   The Zantrex Product Line ............................................................................. 17

    D.   All Zantrex Products Are Primarily Just Caffeine Pills................................. 20

    E.   False Claims Of Safety And Efficacy ........................................................... 21

    F.   Snooki's Marketing And Promotion Of Zantrex ........................................... 31

CLASS REPRESENTATION ALLEGATIONS ......................................................... 41

COUNT I (MAGNUSON-MOSS WARRANTY ACT, 15 U.S.C. §§ 2301, *ET SEQ.*) ............. 43

COUNT II (BREACH OF EXPRESS WARRANTY) ...................................................... 44

COUNT III (DECEPTIVE ACTS OR PRACTICES, N.Y. G.B.L. § 349) ...................... 45

COUNT IV (NEGLIGENT MISREPRESENTATION) ................................................. 45

COUNT V (FRAUD)........................................................................................................ 46

COUNT VI (UNJUST ENRICHMENT)........................................................................ 47

COUNT VI (VIOLATION OF THE MARYLAND CONSUMER PROTECTION ACT)......... 47

RELIEF DEMANDED ............................................................................................................... 48

Plaintiffs Ashley Brady and Stephanie Dalli Cardillo, by and through their attorneys, make the following allegations pursuant to the investigation of their counsel and based upon information and belief, except as to allegations specifically pertaining to themselves and their counsel, which are based on personal knowledge.

<u>**NATURE OF THE ACTION**</u>

1.       This is a class action lawsuit on behalf of purchasers of Zantrex-3 ("Zantrex-3"), Zantrex-3 High Energy Fat Burner ("Fat Burner"), and Zantrex-3 Power Crystals ("Power Crystals," and, together with Zantrex-3 and Fat Burner, "Zantrex"), which are marketed by Defendants as clinically-proven to provide weight control benefits  In fact, all three products' main ingredient is a dangerously large dose of caffeine, which the U.S. Food and Drug Administration ("FDA") has determined is not safe or effective for weight control or appetite suppression.  Indeed, even Amy Heaton, Defendant Zoller Laboratories' Director of Scientific Affairs, admitted to the Los Angeles times that caffeine and caffeine-like compounds "have not been shown to significantly increase weight loss."[1]

2.       All three Zantrex products combine caffeine with a variety of herbal ingredients that are similarly unsafe and ineffective for weight control or appetite suppression.

3.       Defendants have marketed Zantrex through a multimedia advertising campaign featuring reality TV star Nicole Polizzi, a/k/a Snooki, whose image adorns nearly every advertisement for Zantrex.  She also solicits sales of Zantrex through her Facebook account, Twitter account, and through frequent appearances in celebrity magazines including Star Magazine, Life & Style, Reality Weekly Magazine, and OK! Magazine.

4.       The Zantrex-3 labeling and advertising represents that it is safe and effective for "Rapid Weight Loss," and will deliver "546% more weight loss than the leading ephedra-based diet pill."

---

[1] Chris Woolston, *The Healthy Skeptic:  Is Caffeine an Effective Weight-Loss Aid?*, Los Angeles Times, January 9, 2012, *available at* http://articles.latimes.com/2012/jan/09/health/la-he-skeptic-weight-loss-caffeine-20120109.

5.      The Power Crystal's labeling and advertising represents that it is safe and effective for "Rapid Weight Loss" and "Reduced Appetite."

6.      Fat Burner's labeling and advertising represents that it is a "Fat Burner" that is safe and effective for "Rapid Fat Loss."

7.      Each of the representations is false and misleading.  The Zantrex products do not cause weight loss or fat loss.  They are ineffective and worthless.

8.      This is not the first rodeo for Defendants Basic Research, L.L.C. ("Basic Research"), Zoller Laboratories, L.L.C. ("Zoller Labs"), Dennis W. Gay, Daniel B. Mowrey, and Mitchell K. Friedlander (the "Basic Research Defendants").  The Basic Research Defendants have a long history of peddling several weight-loss products to unsuspecting consumers.  Basic Research, Mowrey, Gay, and Friedlander are all subject to an injunction from the Federal Trade Commission ("FTC") proscribing the marketing and sale of alleged weight loss products "unless at the time the representation is made respondents possess and rely upon a reasonable basis for the representation, which shall consist of competent and reliable scientific evidence" (the "FTC Injunction").  The Basic Research Defendants' misrepresentations about Zantrex constitute one of their many violations of the FTC Injunction.

9.      As detailed below, the Basic Research Defendants have relied on the same preliminary Danish "study," reported in 2001, to support their outlandish claims for several of their weight-loss products, including Zantrex-3 and Power Crystals.

10.      But this "study" (referred to herein as the "Anderson/Fogh study") has been explicitly rejected by the FTC.  The FTC notified several of the defendants in 2007 that this very study did not constitute "competent and reliable scientific evidence" for their outlandish claims about Akavar, another one of its weight-loss products.

11.      With regard to Zantrex and numerous other dietary supplements, during the Class Period and for a number of years, the Basic Research Defendants have perpetrated identical or similar schemes to defraud consumers through a web of interrelated, closely-held limited liability companies that oversee the "research," publication, manufacturing, marketing, sales, and distribution of such products in a willful effort to deceive the public as to the true identify and

2

nature of those involved in the illegal business enterprise(s).  At all relevant times, the Basic Research Defendants have operated common business enterprise(s) while engaging in the deceptive acts and practices alleged herein and therefore, may be held jointly and severally liable for such acts and practices.

12.     Although the Basic Research Defendants' common business enterprise creates new companies for the manufacture, advertisement, distribution and sale of most, if not all, of its dietary supplements products, Defendants Gay, Mowrey, and Friedlander control all of the entities within the web of interrelated companies, and each company or entity is engaged in transaction the same or similar business.

13.     Each of the Basic Research Defendants pull from a pool of employees that are used interchangeably between the companies or entities.  Similarly, each of these companies utilizes centralized accounting, payroll, and record-keeping functions.  This results in funds routinely being transferred or commingled between the various companies or entities controlled by Defendants Gay, Mowrey, and Friedlander.

14.     The interrelationship of the Basic Research Defendants is also evidenced by the fact that almost all of them occupy the same office address at 5742 West Harold Gatty Drive, Salt Lake City, Utah  84116.

15.     Plaintiffs are purchasers of Zantrex who assert claims on behalf of themselves and similarly situated purchasers of Zantrex for violation of the Magnuson Moss Warranty Act, breach of express warranty, negligent misrepresentation, fraud, unjust enrichment, and violations of New York General Business Law § 349 and Maryland Consumer Protection Act.

## PARTIES

### A.     Plaintiff Ashley Brady

16.     Plaintiff Ashley Brady is a citizen of New York who resides in Valley Stream, New York.  In late 2010, Ms. Brady purchased a bottle of Zantrex-3 from a CVS Pharmacy located in Nassau County, New York.  Prior to purchase, Ms. Brady carefully read the product's label, including the representations that it would provide her with "Rapid Weight Loss" and "546% More Weight Loss Than America's #1 Selling Ephedra-Based Diet Pill," "in a little over

3

6 weeks" of use, "**WITHOUT** diet and exercise" (emphasis in original).  Ms. Brady relied on these representations in deciding to purchase Zantrex-3.  Ms. Brady saw these representations prior to and at the time of purchase, and understood them as representations and warranties that Zantrex-3 was safe and effective for weight loss.  She relied on these representations and warranties in deciding to purchase Zantrex-3, and these representations and warranties were part of the basis of the bargain, in that she would not have purchased Zantrex-3 if she had known that the product was not, in fact, safe or effective for weight loss.  She also understood that in making the sale, the retailer was acting with the knowledge and approval of Defendants and/or as the agents of Defendants.  She also understood that the purchase involved a direct transaction between herself and Zoller Labs, because her purchase came with Zoller Labs' representations and warranties that the product was, in fact, safe and effective for weight loss.

### B.    Plaintiff Stephanie Dalli Cardillo

17.    Plaintiff Stephanie Dalli Cardillo is a citizen of New Jersey who resides in Boonton, New Jersey.  On July 15, 2013, Ms. Cardillo purchased a bottle of Fat Burner from www.amazon.com for $24.94.  Ms. Cardillo placed the order from, and had the product delivered to, her residence in Snow Hill, Maryland.  Prior to purchase, Ms. Cardillo carefully read the product's label, as it appeared on www.amazon.com, including the representation that it was a "Fat Burner" that would provide her with "Rapid Fat Loss."  Ms. Cardillo also carefully read the product description on www.amazon.com which stated:

> Zantrex-3 Fat Burner provides the same high-energy component
> that the Zantrex brand is famous for, PLUS a clinically tested fat
> burner shown to encourage lipolysis (release of fat from mature
> cells) and inhibit the activity of phosphodiesterase. In other words,
> you lose body fat. Not just body weight, but actual body fat.[2]

Ms. Cardillo relied on these representation in deciding to purchase Fat Burner.  Ms. Cardillo saw these representations prior to and at the time of purchase, and understood them as representations and warranties that Fat Burner was safe and effective for weight loss and fat loss.  Ms. Cardillo also saw Ms. Polizzi's representations in Life & Style Magazine and elsewhere that Fat Burner

---

[2] This product description was provided to Amazon by Defendants for purposes of up-selling Fat Burner.

was safe and effective for fat loss.  And she also read the contents of Ms. Polizzi's "Snooki's Dirty Little Secret" advertisement shown below in ¶ 117.  She relied on these representations and warranties in deciding to purchase Fat Burner, and these representations and warranties were part of the basis of the bargain, in that she would not have purchased Fat Burner if she had known that the product was not, in fact, safe or effective for weight loss or fat loss.  She also understood that in making the sale, the retailer was acting with the knowledge and approval of Defendants and/or as the agents of Defendants.  She also understood that the purchase involved a direct transaction between herself and Zoller Labs, because her purchase came with Zoller Labs' representations and warranties that the product was, in fact, safe and effective for weight loss and fat loss.

18.     Upon receiving the product, Ms. Cardillo carefully read the instructions, and began taking the product as directed.  Shortly thereafter, after taking the prescribed dose of Fat Burner for two days, Ms. Cardillo began to feel ill, including extreme dizziness and shaking, and was admitted to the emergency room at Peninsula Regional Medical Center in Salisbury, Maryland.  Once examined, the doctors confirmed that Ms. Cardillo was experiencing heart palpitations as a result of her Fat Burner consumption.  Ms. Cardillo immediately ceased using the product.

**C.     Defendant Basic Research, L.L.C.**

19.     Defendant Basic Research, L.L.C. is a Utah limited liability company with its principal place of business at 5742 Harold Gatty Drive, Salt Lake City, Utah 84116.  Basic Research develops, manufactures, promotes, markets, distributes, and/or sells Zantrex across the United States, including to hundreds of thousands of consumers in New York.

20.     Basic Research claims that it is one of the largest "nutraceutical" companies in the United States with annual sales revenues in excess of $50 million.  Basic Research develops, manufactures, and markets scores of cosmetics, nutritional supplements, and dietary supplements using nearly a dozen different companies that have been formed by Defendants.  Upon information and belief, Basic Research conducts business under, or is directly affiliated with, many Utah limited liability companies, including, for example, Zoller Laboratories, L.L.C.

("Zoller Labs"), Western Holdings, L.L.C. ("Western Holdings"), Dynakor Pharmacal, L.L.C. ("Dynakor"), Carter-Reed, L.L.C. ("Carter-Reed"), NutraSport, L.L.C. ("NutraSport"), Silver Sage, Klein-Becker USA, L.L.C. ("Klein-Becker"), Customer Service Distribution Center, L.L.C. ("CSDC"), Alpha Gen Biotech, L.L.C. ("Alpha"), Sovage Dermalogic Laboratories, L.L.C. ("Sovage"), Body Innoventions, L.L.C. ("Body Innoventions"), AG Waterhouse, L.L.C. ("Waterhouse"), and BAN, L.L.C., d/b/a Basic Research, Old Basic Research, L.L.C., Waterhouse, Klein-Becker, Dynakor, Sovage, and CSDC ("BAN").

21.    Basic Research, together with defendants Mowrey, Gay, and Friedlander, has a pattern and practice of creating a new limited liability company for each dietary supplement product it manufactures, advertises, or sells to consumers.  Defendants Mowrey, Gay, and Friedlander have a pattern and practice of using the "goodwill" of Basic Research to hold themselves, and their affiliated companies, out to the public as the "Basic Research Family of companies."  In so doing, they make the same or similar false and misleading claims about the same or similar dietary supplement that is merely packaged under a different name and sold by a different entity.  In this case, Basic Research and the other Defendants created Zoller Labs for the sole purpose of serving as a conduit for the nationwide sale of Zantrex to Plaintiffs and Class members.

22.    Moreover, as further discussed below in ¶ 53, Basic Research is subject to a June 19, 2006 Decision and Order issued by the U.S. Federal Trade Commission ("FTC") (the "FTC Injunction").  The FTC Injunction, among other things, proscribes the marketing and sale of alleged weight loss products "unless at the time the representation is made respondents possess and rely upon a reasonable basis for the representation, which shall consist of competent and reliable scientific evidence."  *In the Matter of Basic Research, L.L.C., A.G. Waterhouse, L.L.C., Klein-Becker USA, L.L.C., Nutrasport, L.L.C., Sovage Dermalogic Laboratories L.L.C., BAN, L.L.C., d/b/a Basic Research, L.L.C., Old Basic Research, L.L.C., Basic Research, A.G. Waterhouse, Klein-Becker USA, Nutra Sport, and Sovage Dermalogic Laboratories, Dennis Gay, Daniel B. Mowrey, d/b/a American Phytotherapy Research Laboratory, and Mitchell K.*

6

*Friedlander*, FTC Docket No. 9318 (June 19, 2006).[3]  Basic Research's representations concerning Zantrex – as alleged in this Complaint – constitute violations of the FTC Injunction.

**D.     Defendant Zoller Laboratories, L.L.C.**

23.     Defendant Zoller Laboratories, L.L.C. is a Utah limited liability company with its principal place of business at 5742 Harold Gatty Drive, Salt Lake City, Utah 84116.

24.     Zoller Labs is a wholly-owned subsidiary of Basic Research that was created for the sole purpose of manufacturing, promoting, marketing, distributing, and/or selling Zantrex across the United States, including to hundreds of thousands of consumers in New York and Maryland under the explicit direction of Basic Research, Gay, Mowrey, and Friedlander.

**E.     Defendant Dennis W. Gay**

25.     Defendant Dennis W. Gay ("Gay") is a citizen of Utah, residing in Payson, Utah. Gay is an officer and a principal shareholder of, among other companies, Basic Research and Zoller Labs.  Individually, or acting in concert with the other Defendants, Gay formulates, directs, controls, or participates in the acts and/or business practices alleged in this Complaint. As an officer of Basic Research and Zoller Labs, Gay has final decision-making authority over work carried out in Basic Research's "Marketing Department," which is responsible for the labeling, advertising, and media placement for the dietary supplements sold by Defendants.  Gay, as an officer and principal shareholder of Basic Research and Zoller Labs, is personally responsible for the design, content, approval, distribution, and publication of all Zantrex labeling and advertisements, including the specific advertisements viewed and relied upon by Plaintiffs and Class members, as alleged in this Complaint.  Within the Basic Research Defendants' business enterprise, Gay is ultimately responsible for placing the advertisements for products, including Zantrex, into the stream of commerce and for selling the products in interstate commerce.  Gay has final decision-making power on both the content of advertising and on product pricing.

---

[3] Available at http://www.ftc.gov/os/adjpro/d9318/060619decisionandorder.pdf.

26.     Additionally, Gay has deliberately confused consumers as to the source of various products, including Zantrex, that Defendants manufacture, market, advertise, promote, distribute, and sell.  His intentional tortious acts and personal participation in the wrongful conduct underlying this class action deprive him of any protection he might otherwise have for his personal liability.  In connection with the manufacture, marketing, advertising, promotion, distribution, and sale of Zantrex, Gay has exercised complete dominion and control over Basic Research and Zoller Labs such that these companies are his alter ego, a sham, a facade, and a mere instrumentality for his personal benefit, and he has disregarded and abused the corporate form and structure of these companies.  Gay has misused the corporate form of Basic Research and Zoller Labs to commit an intentional fraud upon the public, in an effort to defeat the ends of justice and otherwise evade the law, including with respect to the manufacture, marketing, advertisement, promotion, distribution and sale of Zantrex.  In addition, Gay has fraudulently created trademarks and the above-mentioned corporations in order to (i) evade detection of his true identity as the individual with dominion and control and (ii) defeat the ends of justice and otherwise evade the law, including with respect to the marketing, advertisement, promotion, distribution, and sale of Zantrex.

27.     Gay is also personally subject to the FTC Injunction described in ¶ 53 of this Complaint.  Gay's activities with regard to the manufacture, marketing, advertising, promotion, and sale of Zantrex constitute a violation of the FTC Injunction.

**F.     Defendant Daniel B. Mowrey**

28.     Defendant Daniel B. Mowrey ("Mowrey") is a citizen and resident of the State of Utah.  Mowrey is a principal shareholder of Basic Research and also holds the title of "Director of Scientific Affairs."  Mowrey is also the owner and sole employee of American Phytotherapy Research Laboratory, Inc. ("APRL"), which is currently known as DBM Enterprises, Inc. ("DBM").  Through APRL and DBM, Mowrey performs "consulting" work solely for Gay, Friedlander, Basic Research, and their affiliated entities.  At all relevant times, APRL and DBM was used as an instrumentality to develop, market, endorse, and promote products – including Zantrex – for Basic Research and Zoller Labs.

29.     Mowrey is responsible for developing the products illegally marketed, advertised, and sold by Defendants, including Zantrex. Within Defendants' business enterprise, Mowrey (i) researches and develops products ideas, concepts, and formulations, (ii) performs "substantiation research," and (iii) reviews advertisements for substantiation. In various nationwide advertisements for dietary supplements marketed and sold by Basic Research, the Basic Research Defendants have often represented that Mowrey is a medical doctor, when he is not. In fact, he merely holds a degree in experimental psychology.

30.     Mowrey, as the "Director of Scientific Affairs" for Basic Research, and as a "consultant" to Zoller Labs, is responsible for the design, content, approval, distribution, and publication of all Zantrex advertisements disseminated during the Class Period, including those viewed by Plaintiffs. Mowrey's title of "consultant" is meaningless – he is an insider to Defendants' business enterprises and has access to their computer networks and records. Mowrey's intentional tortious acts and personal participation in the wrongful conduct underlying this class action deprive him of any protection he might otherwise have for his personal liability.

31.     Mowrey is also personally subject to the FTC Injunction described in ¶ 53 of this Complaint. Mowrey's activities with regard to the manufacture, marketing, advertising, promotion, and sale of Zantrex constitute a violation of the FTC Injunction.

**G.    Defendant Mitchell K. Friedlander**

32.     Defendant Mitchell K. Friedlander ("Friedlander") is a citizen and resident of the State of Utah. Friedlander is the self-proclaimed "marketing guru" of Basic Research and has been described as the "idea man" behind numerous advertising campaigns for dietary supplements carried out by Defendants and their affiliated companies. Friedlander is a "marketing consultant" to, among others, Gay, Mowrey, Basic Research, and Zoller Labs. Friedlander is directly involved in the development, manufacture, endorsement, advertising, marketing, and promotion of Basic Research products, including Zantrex. Friedlander is responsible for the design, content, approval, distribution, and publication of Defendants' advertisements, including the Zantrex advertisements viewed by Plaintiffs. Although he is neither an employee of Basic Research nor Zoller Labs, Friedlander maintains his offices at the

9

corporate headquarters of Basic Research.  Despite his "consultant" role, Friedlander receives "royalty" payments from Basic Research for each sale of various products marketed by Basic Research pursuant to a 1993 royalty agreement and/or covenant not to sue between Friedlander and Basic Research.

33.     On September 10, 1985, the U.S. Postal Service ("USPS") issued "Cease and Desist" and "False Representation" orders against Friedlander in connection with his activities concerning the marketing and sale of weight-loss dietary supplements called "Intercal-SX," "Metabolite-2050," and "Anorex-CCK."   These products were falsely advertised as (i) causing weight loss in virtually all users, (ii) causing weight loss without willpower or caloric restricting diets or exercise, (iii) preventing foods from being converted into stored fat, (iv) being supported by scientifically sound clinical studies, and (v) allowing obese persons to lose weight while continuing to eat all the food that such persons wanted.  The USPS found reports cited by Friedlander insufficient to support his "exaggerated claims."  Accordingly, the USPS issued cease and desist orders preventing Friedlander and his companies from continuing to make false claims about the effectiveness of his weight loss products.  *See In the Matter of the Complaint Against W.G. Charles Company, Customer Service Distribution Center, Inc., Mitchell K. Friedlander, Harris Friedlander, and Michael Meade*, U.S. Postal Service Docket No. 19/104 (Sept. 10, 1985) and  *In the Matter of the Complaint Against The Robertson-Taylor Company, Intra-Medic Formulations, Inc.*, *Customer Service Distribution Center, Inc., Mitchell K. Friedlander, Harris Friedlander, and Michael Meade*, U.S. Postal Service Docket No. 19/162 (Sept. 10, 1985).[4]

34.     On September 30, 1985, the USPS issued a second Postal Service Decision concerning Friedlander.  This time, the USPS found Friedlander's advertisements for three breast enlargement products – Macrocell-D58 Liquid Concentrate, Mamralin-BX2, and Breast Formula XP-39 – were "materially false as a matter of fact."  Contrary to Friedlander's advertisements, the USPS found that these products would not cause a woman's breasts to become larger.  As

---

[4] Available at http://about.usps.com/who-we-are/judicial/admin-decisions/1985/19-104dd.htm.

with the weight loss products, the USPS ordered Friedlander to cease and desist from making further false claims about the effectiveness of his breast enlargement products. *See In the Matter of the Complaint Against The Robertson-Taylor Company, Intra-Medic Formulations, Inc.*, *W.G Charles Company, Customer Service Distribution Center, Inc., J.F. Pharmaceuticals, Mitchell K. Friedlander, Harris Friedlander, and Michael Meade*, U.S. Postal Service Docket Nos. 19/105, 19/161, and 20/32 (Sept. 30, 1985).[5]

35.     On February 26, 1986, following a six-day bench trial in an action brought by the Department of Justice and the FTC, the Southern District of Florida permanently enjoined Friedlander from advertising that his weight loss products caused weight loss without exercising or restricting caloric intake. *See FTC v. Intra-Medic Formulations, Inc.*, No. 85-2819-Civ-Nesbitt (S.D. Fla. Feb. 26, 1986).

36.     Friedlander is also personally subject to the FTC Injunction referenced in ¶ 53 of this Complaint. Friedlander's activities with regard to the marketing, advertising, and sales of Zantrex constitute a violation of the FTC Injunction, and such violation is evidence of Defendants' scheme or artifice to defraud Plaintiffs and Class members.

**H.     Defendant Nicole E. Polizzi a/k/a Snooki**

37.     Defendant Nicole E. Polizzi a/k/a Snooki is a citizen of New York who resides in Marlboro, New York.

38.     Snooki is a paid spokesperson for Zoller Labs. Not only is she the primary endorser of Zantrex products, she is, in fact, the face of the Zantrex brand. In her role as paid spokesperson, Snooki has appeared in nearly every advertisement for Zantrex products. Throughout the class period, Snooki has promoted Defendants' products (i) on their websites, (ii) on social media websites YouTube, Twitter, and Facebook, and (iii) in celebrity gossip magazines such as Star Magazine, Life & Style, Reality Weekly Magazine, and OK! Magazine.

---

[5] Available at http://about.usps.com/who-we-are/judicial/admin-decisions/1985/19-105.htm.

39.     At all times relevant to the allegations in this matter, each Defendant acted in concert with, with the knowledge and approval of, and/or as the agent of the other Defendants within the course and scope of the agency, regarding the acts and omissions alleged.

## JURISDICTION AND VENUE

40.     This Court has subject matter jurisdiction under 28 U.S.C. § 1331 (federal question).  This Court has supplemental jurisdiction over state law claims pursuant to 28 U.S.C. § 1367.

41.     This Court also has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) because there are more than 100 class members and the aggregate amount in controversy exceeds $5,000,000.00, exclusive of interest, fees, and costs, and at least one Class member is a citizen of a state different from Defendants.

42.      Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 because Defendants do business throughout this District, and Plaintiff Brady resides in this District.

43.     All conditions precedent to the bringing of any and all causes of action herein have been satisfied, including any notice and opportunity for corrective action requirements. Attached as Exhibit "A" is a true and correct copy of Plaintiff's MMWA notice letters.[6]

## FACTS COMMON TO ALL CAUSES OF ACTION

44.     Fraudulent weight loss products are an enormous problem in the United States.  In an October 2011 FTC study entitled *Consumer Fraud in the United States:  The Third FTC Survey* (the "FTC Survey"), the FTC stated that an estimated 2.1% of all consumers nationwide – representing a total of 531 million U.S. adults – purchased and used fraudulent weight-loss products during the preceding year.  The FTC Survey found that "[m]ore consumers were victims of fraudulent weight-loss products than of any of the other frauds covered by the 2011

---

[6] On November 11, 2013, defendants Basic Research and Zoller Labs filed a lawsuit in Utah state court against Plaintiffs' counsel in response to receiving pre-suit notices letters from Ms. Brady.  The complaint alleges "disparagement" of the two entities and "several consumer products" they "manufactured, distributed, advertised and sold" in the above-referenced pre-suit notice letter which Plaintiffs' counsel sent to defendant Nicole Polizzi, the spokesperson for the products, on September 12, 2013 in contemplation of this action.  A true and correct copy of the complaint is attached hereto as Exhibit "B".

survey."  The FTC Survey describes the prototypical fraudulent weight-loss claim as products that were promoted "as enabling consumers who used the product to easily lose a substantial amount of weight or to lose the weight without diet or exercise."  As alleged herein, the Zantrex products, advertised and sold by Defendants during the Class Period, are prototypical fraudulent weight-loss products.[7]

## A.    Defendants' History

45.    The Basic Research Defendants are all well-experienced in the promotion, marketing, and sale of alleged weight-loss products through false and deceptive advertising.  As alleged herein, Defendants Gay, Mowrey, and Friedlander are each the subject of the FTC Injunction.  These Defendants' activities with regard to the marketing, advertising, and sales of Zantrex during the class period constitute a violation of the FTC injunction, and such violation is evidence of Defendants' scheme or artifice to defraud Plaintiffs and class members.  As a result, every act the each of the Basic Research Defendants undertook, or caused the other Defendants to undertake, to market, advertise, and sell Zantrex was part of a scheme or artifice to defraud Plaintiffs and class members.

46.    At the center of Defendants' interrelated business enterprises lies Basic Research, which was created to capitalize on the above-referenced obesity and overweight epidemic and resulting interest in weight-loss products.  Basic Research markets, advertises, and sells scores of products, which are marketed under the names of nearly a dozen companies in an effort to confuse competitors and consumers by creating a convoluted and complex web of organizations.

47.    Defendant Gay, as a principal of Defendant Basic Research and all affiliated companies created by the Basic Research Defendant for the sole purpose of illegally marketing weight loss products, is responsible for, among other things, the oversight and conduct of the Basic Research Defendants' illegal corporate enterprise.

---

[7] The FTC Survey is available at
http://www.ftc.gov/sites/default/files/documents/reports/consumer-fraud-united-states-2011-third-ftc-survey/130419fraudsurvey_0.pdf.

48.     Defendant Mowrey, a psychologist who has previously (and unlawfully) held himself out to be a medical doctor, is responsible for, among other things, working with other persons to formulate "new" compounds comprised of the same "core ingredients," in order to create new opportunities for the Basic Research Defendants to illegally market their dietary supplements, including Zantrex, which are nothing more than modern-day "snake oil."

49.     Defendant Friedlander, who is the self-proclaimed "marketing guru" behind the Basic Research Defendants' business enterprises and products, has a long history of unlawful activity involving the marketing, advertising, promotion and sale of alleged weight-loss products. Despite his record of wrongdoing and violations of federal and state laws, Friedlander remains responsible for, among other things, developing the marketing and advertising "platform" for the dietary supplements.

**B.      Defendants' Pattern and Practice of Illegal Marketing and Advertising**

50.     Prior to selling Zantrex, the Basic Research Defendants had a long history of peddling useless dietary supplements and over-the-counter ("OTC") products without any scientific support.  The Basic Research Defendants claim their useless supplements give people "hope."  According to Don Atkinson, Vice President of Sales for Basic Research:

> The customer has been overweight for years.  And they have tried everything.  And they have been on Atkins and everything else and nothing has worked.  And some of these people are so incapacitated by their weight and their problems associated with it that they would like to die.  Just wish they could just die.  And they dial up and they are unhappy people.  And they think, O.K., if I take this and it doesn't work it's further evidence that I am a failure.  Our job is to give them hope.  To say, "You know what?  You can do this." … I love my job.  And do you know why?  Because when I get up in the morning I know that somebody's life is better because we are here.  Somebody today got some hope.
>
> You know what is great about [a bottle of Zantrex-3 falling out of Britney Spears's purse]?  It's the fact that she is using a weight-loss product and she looks terrific.  Just the fact that we are even talking about what Britney Spears uses or doesn't use to keep her weight down tells the whole wide world that it's O.K. to be a little overweight and it's O.K. to work on it.  And it's O.K. to use things to help you get there.  That's what it all says to me, and that is why we are here.[8]

---

[8] Michael Specter, *Miracle in a Bottle*, The New Yorker, February 2, 2004 at 66; available at http://www.michaelspecter.com/wp-content/uploads/miracle.pdf.

51.     Not everyone shares this perspective.  In fact, the Basic Research Defendants and the dietary supplement industry have been the source of controversy for years, often coming under fire for ineffective products and false and misleading advertisements.  For example, on June 16, 2004, during a House Hearing on the Health Concerns About Dietary Supplements For Overweight Children (the "2004 House Hearing"), Congressman James C. Greenwood, Chairman of the Subcommittee on Oversight and Investigations of the Committee on Energy and Commerce, upon hearing testimony from Gay, correctly labeled the Basic Research Defendants as "scam artists:"

> This is the assessment then, the conclusion that I am coming to from what I have heard so far.  And that is that any scam artists or group of scam artists who wants to get rich quick, preying on the emotional pain of people suffering weight loss can go to a phony laboratory, give a screwball list of ingredients that are not proven to do a darn thing, put it in a pill, put the pill in a bottle, put the bottle in a box and make a mint.  That is my conclusion from what I have heard today.[9]

52.     In fact, on June 16, 2004, the same day as the House Hearing, the FTC brought a complaint (the "FTC Complaint") against, among others, Basic Research, L.L.C., Dennis Gay, Daniel B. Mowrey (d/b/a American Phytotherapy Research Laboratory), and Mitchell K. Friedlander for claims they made in their marketing of six weight loss products.[10]  Three of the products – Tummy Flattening Gel, Cutting Gel, and Dermalin APg – were skin gels that claimed to melt away fat wherever applied, including a user's thighs, tummy, or a double chin.  Two of the products – Leptoprin and Anorex – were ephedrine-based diet pills that claimed to cause weight loss of more than 20 pounds.  The final product was PediaLean – fiber pills marketed for overweight children that claimed to cause substantial weight loss.  The FTC alleged that the defendants (i) neither possessed nor relied on a reasonable basis that substantiated these claims, (ii) falsely claimed that clinical testing proved those claims for four of the challenged products, and (iii) misrepresented their spokesperson (Mowrey) as a medical doctor.

---

[9] *Parents Be Aware:  Health Concerns About Dietary Supplements For Overweight Children Before the Subcomm. On Oversight and Investigations of the H. Comm. On Energy and Commerce*, 108th Cong. (2004), available at http://www.gpo.gov/fdsys/pkg/CHRG-108hhrg95442/html/CHRG-108hhrg95442.htm.

[10] Complaint, *In re Basic Research*, F.T.C. Docket. No. 9318 (2006), available at http://www.ftc.gov/os/adjpro/d9318/0023300part3cmp040616.pdf.

53.     On June 19, 2006, the FTC issued the FTC Injunction as a result of the FTC Complaint against Basic Research, Gay, Mowrey, and Friedlander.[11]  Basic Research was ordered to pay $3 million settlement on behalf of all respondents.  Additionally, the FTC Injunction prohibited Basic Research, Gay, Mowrey, and Friedlander from making unsubstantiated claims.  Specifically, the FTC Injunction prohibited them, "directly or through any corporation, subsidiary, division, or other device" from:

> A. [R]epresent[ing], in any manner, expressly or by implication, including through the use of the names "Cutting Gel," "Tummy Flattening Gel," "Anorex" and "PediaLean," or other trade names, or through the use of endorsements, that such product causes weight or fat loss, unless at the time the representation is made, respondents possess and rely upon a reasonable basis for the representation, which shall consist of competent and reliable scientific evidence;

> B. [M]ak[ing] **any representation**, in any manner, expressly or by implication, including through the use of trade names or endorsements, about the effect of such food, drug or dietary supplement on any disease, or ***about the effect of such food, drug or dietary supplement on the structure or function of the human body or other health benefits or weight loss benefits, unless at the time the representation is made respondents possess and rely upon a reasonable basis for the representation, which shall consist of competent and reliable scientific evidence***; (emphasis added)

> C. **[M]isrepresent[ing]**, in any manner, expressly or by implication, including through the use of endorsements or trade names, **the existence, contents, validity, results, conclusions, or interpretations of any test, study, or research**; (emphasis added) [and]

> D. [M]isrepresenting, in any manner, expressly or by implication, including through the use of endorsements:  A. That respondent Daniel B. Mowrey is a medical doctor; or B. The profession, expertise, training, education, experience or qualifications of Mowrey or any other endorser.

54.     On November 2, 2007, the FTC sent Defendants a letter informing them that Basic Research, Carter-Reed, Dynakor Pharmacal, Gay, and Friedlander were in violation of the FTC Injunction.  The letter stated that certain of Basic Research's advertising claims were not substantiated and concluded that the Andersen/Fogh study produced by Basic Research was not competent and reliable scientific evidence, rendering it insufficient to support the Basic Research Defendants' claims about their Akavar 20/50 product.  This is the same flawed study on which

---

[11] Decision And Order, *In re Basic Research, L.L.C.*, Dkt. No. 9318 (2006), *available at* http://www.ftc.gov/os/adjpro/d9318/060619decisionandorder.pdf

Defendants rely for their false and misleading representations about the safety and efficacy of

Zantrex.  According to the letter:

> **Explanation of Violation:**  Advertisements for Akavar represent that users can
> eat all they want and still lose weight, which conveys the implied claim that users
> can eat unlimited amounts of food and still lose weight.  The Andersen/Fogh
> study does not constitute competent and reliable scientific evidence that users
> taking Akavar can eat unlimited amounts of food and still lose weight....[12]

55.     On November 2, 2009, the FTC brought a lawsuit in the District of Utah against

Basic Research, Carter-Reed, Dynakor Pharmacal, Gay, and Friedlander.  *See U.S. v. Basic*

*Research, L.L.    C.*, No. 09-cv-972 (D. Utah Nov. 2, 2009) consolidated with *Basic Research v.*

*F.T.C.*, No. 09-cv-007799, 807 F. Supp. 2d 1078 (D. Utah 2011).  The FTC alleged the

defendants violated the FTC Injunction by claiming, without a reasonable basis, that Akavar

20/50 lets you "eat all you want and still lose weight," and that it automatically restricts caloric

intake with no willpower required of users to limit food or caloric intake.  The FTC also alleged

they misrepresented scientific research by claiming that a test proved their claims that Akavar

caused both substantial weight loss and weight loss for virtually all users.  *Basic Research v.*

*F.T.C.* is still pending in the District of Utah.

**C.     The Zantrex Product Line**

56.     The Zantrex product line, as shown below, includes three component products:

Zantrex-3, Fat Burner, and Zantrex-3 Power Crystals.

---

[12] A true and correct copy of the FTC's Nov. 2, 2007 letter is attached hereto as Exhibit C.



57.     Zantrex-3 is touted by Defendants as "the first and only non-ephedra 'diet pill' with a kick" and "America's hottest selling new 'Super Pill.'"  Defendants guarantee that Zantrex delivers "5 times more weight loss than the leading ephedrine-based diet pill and all the energy you'll ever want or need… day or night." (ellipses in original).  According to Defendants,

> Zantrex-3 [is] … 546% more weight loss than the leading ephedrine-based diet pill … and that's a fact.  Here's another fact:  Zantrex-3 is way beyond ephedrine, way beyond fat-burners, way beyond everything … Zantrex-3 is a new category of bifurcated weight-loss compounds providing both rapid weight loss and incredible energy combined into a single power-packed Super Pill.  New Zantrex-3 is so powerful you won't find it in any supermarket next to some 'Flintrock' vitamin for kiddies. (ellipses in original).[13]

58.     In furtherance of these false claims, the following advertisement appears on the Zantrex website.  Similar versions have also appeared on the New York City subway:[14]

---

[13] See http://www.zantrex3.com/zantrex3-americas-diet-pill.

[14] It should be noted that Defendants misleadingly portray a dancing couple in this advertisement.  In reality, neither model has ever taken Zatnrex, and they have no affiliation to Defendants.  It is a stock photo that appears in countless other places on the internet. *See, e.g.,* http://www.stageproacademy.co.uk/adult-salsa-classes/; http://www.springhillrec.org/Salsa-Dancing.html; http://www.blackpoolsixth.ac.uk/activities/salsa-dancing-1-hour-on-wednesday-afternoons.



59.    As the advertisement displayed above in ¶ 58 shows, Defendants attempt to

mislead readers into believing that clinical studies have been conducted on Zantrex, although

they have not.  Defendants attempt to accomplish this by using ellipses in various parts of the

advertisement, though they are not actually summarizing anything.  At the bottom of the

advertisement, on the right side, under the "DIRECTIONS" section, Defendants purport to

disclose the truth that studies have never been conducted on Zantrex, but do so in a font-color so

light as to be completely unnoticeable and practically unreadable to anyone viewing the advertisement.[15]

60.     Fat Burner promises "Rapid Fat Loss.  Incredible Energy."  It is said to "provide[] the same high-energy component that the Zantrex brand is famous for, PLUS a clinically tested fat burner shown to encourage lipolysis (release of fat from mature cells) and inhibit the activity of phosphodiesterase.  In other words, you lose body fat.  Not just body weight, but actual body fat."  Moreover, Defendants claim its better than any fat burner on the market today and contains an ingredient that specifically burns fat from "mature cells."[16]

61.     The Power Crystals product is described as "the same high-energy weight-loss formula as in the original Zantrex-3, but in a convenient, great tasting drink mix you can take anywhere."[17]  The Power Crystals make the same claim as Zantrex-3 that it is safe and effective for "Rapid Weight Loss."  The Power Crystals are the same exact product as Zantrex-3, just in a different form.

**D.     All Zantrex Products Are Primarily Just Caffeine Pills**

62.     The "proprietary blend" used to formulate Zantrex-3 and Power Crystals is primarily a blend of different forms of caffeine.  While Defendants list that the products contain "Trimethylxanthine (caffeine)" they do not note that the majority of the other ingredients listed in their "proprietary blend" as also different forms of caffeine, including:

- Yerba Mate (leaf) Extract [caffeine];

- Guarana (seed) Extract [caffeine];

- Green Tea (leaf) Extract [caffeine];

- Kola (seed) Extract [caffeine];

- Cacao (seed) Extract [caffeine];

---

[15] The gray, obscured text says "The '546% weight loss' claim is based solely on Zantrex-3's weight loss active component."

[16] *See* http://www.zantrex3.com/zantrex3-snooki-diet-page.  Ms. Polizzi's likeness and endorsement of the product originally appeared on this webpage, but she removed it after receiving Plaintiff's pre-suit notice letter in September 2013.  She apparently forgot to remove the word "snooki" from the actual web address however.

[17] *See* http://www.zantrex3.com/product-crystals.

- Black Tea (leaf) Extract [caffeine].

63.     Similarly, Fat Burner's "proprietary blend" includes:

- Guarana (fruit) Extract [caffeine];

- Coffee (bean) Extract [caffeine];

- Kola (seed) Extract [caffeine];

- Green Tea (leaf) Extract [caffeine].

64.     The remainder of the ingredients in these "proprietary formulas" are a variety of herbal ingredients which are likewise ineffective for weight loss and fat loss.

**E.      False Claims Of Safety And Efficacy**

65.     Defendants' marketing and promotion of Zantrex includes numerous false and misleading claims concerning the products' safety, efficacy, and mechanism of action.

### *i.  Caffeine Is Not Effective For Weight Loss Or Fat Loss*

66.     All Zantrex products are promoted as effective for "Rapid Weight Loss" or "Rapid Fat Loss."  This is false.  The "active" ingredients in the Zantrex products are not effective for "Rapid Weight Loss" or "Rapid Fat Loss."

67.     Both Zantrex-3 and Power Crystals contain the same "Active Weight-Loss Compound:  Yerba Mate (leaf) [caffeine], Guarana (seed) [caffeine], and Damiana (lead) extracts."  Likewise, Fat Burner's "Fat Burning Compound [is]:  Citrus (fruit) Extract and Guarana (fruit) Extract [caffeine]."  Although at least three of these are simply different forms of caffeine, Defendants' failure to disclose that caffeine constitutes a majority of these active ingredients is misleading.  Even so, caffeine is not effective for weight loss or fat loss.

68.     According to the FDA, "there are inadequate data to establish general recognition of the safety or effectiveness of … [caffeine] for the specified use[] [of weight control]."  21 C.F.R. § 310.545(a)(20).

69.     Even Zoller Labs' own Director of Scientific Affairs, Amy Heaton, admitted to the Los Angeles Times that caffeine and caffeine-like compounds "have not been shown to significantly increase weight loss."[18]

70.     This view is also supported by C. Michael White, Pharm.D., Professor and Department Head of Pharmacy Practice at the University of Connecticut.  Dr. White told the Los Angeles Times, in connection with its article about Zantrex, that "there are no well-designed studies showing that caffeine works better than a placebo when it comes to weight loss."[19]

### ii.   Zantrex-3 Does Not Provide "546% More Weight Loss Than 'America's #1 Selling Ephedra-Based Diet Pill'"

71.     Despite the fact that caffeine is unsafe and ineffective for weight and fat loss, Defendants expressly represent on Zantrex-3's label and website that Zantrex-3 provides "546% More Weight Loss Than 'America's #1 Selling Ephedra-Based Diet Pill'" "in a little over 6 weeks" of use, "**WITHOUT** diet and exercise"  (the "546% Claim").  This is false and misleading.

72.     At a fundamental level, comparing Zantrex-3 to an "ephedra-based diet pill" is inherently misleading because the FDA banned the sale of ephedra-based diet pills in 2004. Notwithstanding, Defendants compare two studies and offer the comparison as proof of their 546% Claim.  The problem, however, is that Defendants frame and present these studies, as shown by the label below, in a biased, manipulative, and misleading manner:

---

[18] Chris Woolston, *The Healthy Skeptic:  Is Caffeine an Effective Weight-Loss Aid?*, Los Angeles Times, January 9, 2012, *available at* http://articles.latimes.com/2012/jan/09/health/la-he-skeptic-weight-loss-caffeine-20120109.

[19] *Id.*



73.     Moreover, the two studies chosen by Defendants are not only severely flawed, but they are also unrelated to Zantrex.  Indeed, even Mowrey acknowledges that "the [546%] figure was based not on a direct comparison of the two diet products but on extrapolations of results from **unrelated studies**."[20]

---

[20] Michael Specter, *Miracle in a Bottle*, The New Yorker, February 2, 2004 at 72; *available at* http://www.michaelspecter.com/wp-content/uploads/miracle.pdf (emphasis added).

74.     As purported proof of Zantrex-3's effectiveness, Defendants offer two studies, which they refer to as "Their Study" and "Our Study."  According to Defendants, "Their Study" shows that people who took:

> "America's best seller" WITH diet and exercise[…]for 8 weeks experienced an average weight loss of 4.8 ounces per week more than the placebo group.  Yes, you heard right…four point eight ounces.  That's less than one-third of a pound per week better than placebo, for 8 weeks – a grand total of less than 2 and ½ pounds of additional weight loss after 56 days and nights of diet and exercise when compared to a sugar pill.

"Their Study" is then directly to compared to "Our Study," which Defendants claim shows that people who take the

> active formula in Zantrex-3 WITHOUT diet and exercise […] for a little over 6 weeks, experience[] an average weight loss of a whopping 11.2 pounds – 1696% more weight loss than the placebo group, and 546% more weight loss per week (over and above placebo…of course) than the entire group of people who used "America's best seller" – and that's without having to follow any prescribed diet plan or supervised exercise program!  That's the power of the active Zantrex-3 formula.

75.     There are numerous problems with Defendants' characterization and comparison of these studies.  The studies bore no relevance to each other, because they ultimately employed very different sampling sizes, controls, duration, and protocols.

76.     More importantly, the studies themselves are so flawed that neither provides any meaningful data from which a comparison may be drawn.

### *1. "Their Study"* [21]

77.     Defendants rely on "Their Study" to establish the effectiveness of "America's #1 Selling Ephedra-Based Diet Pill" which is then used as a baseline for comparison with Zantrex.  The study measured weight and fat loss in 30 subjects, of whom 23 were male and 7 were female.  The experimental group was given Xenadrine – a weight loss pill containing ephedrine

---

[21] Kalman, et. al. (2000), Effects of Weight-Loss Aid in Healthy Overweight Adults:  Double-Blind, Placebo-Controlled Clinical Trial.  Current Therapeutic Research, Vol. 61, No. 4., available at http://download.journals.elsevierhealth.com/pdfs/journals/0011-393X/PIIS0011393X00890347.pdf.

alkaloids (20 mg), synephrine (5 mg), caffeine (200 mg), and salicin (15 mg) – twice daily for eight weeks.  However, "Their Study" flawed for several reasons.

78.     First, the sample group – of which 12 were in the experimental group and 13 were in the placebo group – is wholly inadequate in light of the fact that the sample group had roughly three males for each female.  No reputable study would use such a small sample size; this fact, alone, discredits any purported results.  No legitimate researcher or scientist would rely on these data.

79.     Second, only 25 of the 30 subjects actually completed the study.  The fact that 5 out of 30 (16.66%) subjects dropped out of the study prior to completion indicates severe compliance issues, and suggests that the remaining subjects have not strictly followed the requirements of the study.

80.     Third, the experiment was not truly double blind because the active group – who received a cocktail of ephedrine and caffeine – would certainly know they were taking large amounts of stimulants.  Given the amount of stimulants found in Xenadrine, it would be immediately obvious if a participant took the active pill versus a placebo.

81.     Fourth, the study's duration was only eight weeks.  Additionally, during that time, the subjects were tested only three times (at the outset, at four weeks, and at eight weeks).  Both of these facts show the study incapable of producing meaningful results.

82.     Fifth, there is no discussion of long-term results or any follow-up.  As a result, the study does not show whether the reported weight loss was permanent or merely temporary.

### 2. "Our Study" [22]

83.     As discussed above, Defendants rely on "Our Study" (also referred to herein as the "Andersen/Fogh study") to support their claims about Zantrex-3's effectiveness.  However, Defendants' characterization of this study and its results, as presented on the Zantrex-3 label and

---

[22] Andersen T. & Fogh J. (2001), Weight loss and delayed gastric emptying following a South American herbal preparation in overweight patients, J Hum Nutr Dietet 14, pp. 243-250, available at http://www.ncbi.nlm.nih.gov/pubmed/11424516?ordinalpos=6&itool=EntrezSystem2.PEntrez.P ubmed.Pubmed_ResultsPanel.Pubmed_DefaultReportPanel.Pubmed_RVDocSum.

their website, are false and misleading and offer no support for the promised effectiveness of Zantrex-3.

84.     "Our Study" lasted for 45 days and measured weight loss in 47 subjects, of whom 32 were female and 15 were female.  Before each meal, subjects in the experimental group took three capsules, each containing exactly three ingredients:  112 mg of Yerbe Mate extract, 95 mg Guarana extract, and 36 mg of Damiana extract ("YGD").  As with "Their Study," "Our Study" is flawed for numerous reasons such that no legitimate researcher or scientist would rely on these findings.

85.     First, the sample size – of which 24 were in the experimental group and 23 were in the placebo group – is wholly inadequate in light of the fact that the sample group had roughly two women for each male.  No reputable study would use such a small sample size; this fact, alone, discredits any purported results.

86.     Second, the study duration was also inadequate.  Forty-five days is simply an insufficient amount of time to gather meaningful data as to weight loss and fat loss.  The FTC agrees with this criticism, stating that "the length of the [Andersen/Fogh] study, 45 days, may be insufficient to assess weight loss."

87.     Third, the subjects were not required to record their dietary intake.  Accordingly, it is impossible to know whether the weight loss was due to YGD, or perhaps a decreased dietary intake.

88.     Fourth, there was no adequate monitoring of rebound.  Instead, the study was unexpectedly extended for 12 months – during which period 22 of the 24 subjects in the experimental group continued their YGD treatment.  The study's authors admit that the extended treatment and observation period "was not intended to be a controlled trial."  Accordingly this data lacks any scientific merit.

89.     Fifth, the experiment was not truly double blind because they experimental group – who received YGD, which is mostly caffeine – would certainly know they were taking large amounts of stimulants versus a placebo.

90.     Sixth, there is no indication this clinical study was peer reviewed.  The credibility of the study is further suspect given that it was not published in a reputable journal.

91.     Seventh, the article reporting "Our Study" states that the study's results should be considered preliminary:  "[T]his herbal preparation may prove to be an additional new method for facilitating weight loss.  Further clinical studies with dietetic monitoring of energy intake, dietary quality, satiety ratings, body weight and body composition are now indicated…."

92.     Eighth, the fact that the article reporting "Our Study" does not contain a statistical analysis calls into question the reliability of the study as support for any weight loss claim.

93.     Finally, the data does not support generalization to the population at large.  As such, the study cannot support the claimed effectiveness of Zantrex-3.

94.     Defendants' use of "Our Study" is false and misleading, even when its flaws are ignored.  Defendants' market Zantrex-3 as being backed by scientific studies, in particular "Our Study."  "Our Study" did not actually study Zantrex-3 but rather only a specific combination of YGD.  This is false and misleading because Zantrex-3 contains at least ten additional ingredients other than YGD.  The FTC expressed a similar concern in their November 2, 2007 letter, stating Defendants' "inclusion of ingredients in addition to the YGD compound . . . may cause additional effects that cannot be attributed to YGD alone."[23]

95.     Moreover, "Our Study" is worthless as to the effectiveness of Zantrex-3 because Defendants' do not disclose the exact amount of YGD in Zantrex-3.  Here too, the FTC expressed a similar concern:

> the preparations of yerba mate, guarana, and damiana used in the study may differ from those in Respondents' products, even though the amount of the ingredients may be the same in both.  ***The Dietary Supplement guidelines note (at 18) that marketers should not rely solely on clinical trials using different extract preparations as competent and reliable evidence of efficacy.***"[24]

---

[23] *See* Ex. C.

[24] *Id.*

96.     Since there is not a single representation that the combination of YGD is the same as that tested in "Our Study," Defendants' use of "Our Study" is not only as to their claims of effectiveness, but it is false and misleading.

97.     The FTC agrees.  Defendants previously offered "Our Study" to support claims that Akavar (another YGD-based weight loss product marketed by the Basic Research Defendants) "allow[ed]" users to eat unlimited amount of food and still lose weight."  As the FTC explained in its November 2, 2007 letter to Defendants:

> **Explanation of Violation:** Advertisements for Akavar represent that users can eat all they want and still lose weight, which conveys the implied claim that users can eat unlimited amounts of food and still lose weight.  *The Andersen/Fogh study does not constitute competent and reliable scientific evidence that users taking Akavar can eat unlimited amounts of food and still lose weight....*[25]

Nonetheless, Defendants attempt to pass off the exact same study as credible support for their claims that Zantrex is effective even "**WITHOUT** diet and exercise." (emphasis in original).

98.     Given these flaws, Defendants claims about Zantrex-3's effectiveness are rendered both false and misleading.

### iii. The Zantrex Products Are Not Safe When Taken As Labeled

99.     Not only are the Zantrex products ineffective for weight loss and fat loss, but they are also unsafe when taken as labeled.

100.    The amount of caffeine in the recommended daily serving is a shockingly high: 900 mg per day.  For comparison, there is a general consensus that adults can drink between 300-400 mg of caffeine per day without any adverse effects.[26]

101.    Zantrex-3's label states that it contains about 300 mg of caffeine mixture per serving while Zantrex-3 Fat Burner contains 200 mg of caffeine per serving.  However, these claims are false and misleading because only some of the caffeine-containing ingredients are

---

[25] *Id.* (emphasis added).

[26] Heckman, M. A., Weil, J. and De Mejia, E. G. (2010), Caffeine (1, 3, 7-trimethylxanthine) in Foods: A Comprehensive Review on Consumption, Functionality, Safety, and Regulatory Matters. Journal of Food Science, 75: R77–R87. doi: 10.1111/j.1750-3841.2010.01561.x (available at http://onlinelibrary.wiley.com/doi/10.1111/j.1750-3841.2010.01561.x/full#b92).

identified as "active."  According to a 2012 clinical trial from the University of Copenhagen, Zantrex contains 365 mg of caffeine per serving, or 1,095 mg per day, which is more than 32 cans of Coca-Cola Classic or 13 espresso shots.[27]  These numbers are in line with independent laboratories tests finding Zantrex to contain over 1,200 mg of caffeine.[28]  That's a bigger jolt than you would get from 35 cans of Classic Coke of 12 cups of espresso.

102.    Despite the large amount of caffeine in Zantrex, Defendants proclaim Zantrex "WORKS WITH ANY SENSIBLE DIET AND EXERCISE PROGRAM."  This is false.

103.    According to Dr. Louis Arrone, an internal medicine specialist at Cornell University's Weill Medical College, "the problem is that two thirds of the population is overweight and obese and many of those people have high blood pressure, diabetes, high cholesterol.  They have risk factors for cardio vascular disease.  When you mix that with a powerful stimulant it's a recipe for disaster."[29]

104.    Gerald Endress, the fitness director of the Duke University Diet and Fitness Center, elaborates on these concerns, warning that the high doses found in Zantrex – could cause jitteriness, anxiety, spikes in blood pressure, and rapid heartbeats. Indeed, Dr. Mikhale El-Chami, a cardiologist at Emory University Hospital, warns that "[a]bnormal heart rhythms, such as Lone Atrial Fibrillation ('A-Fib') … can be trigged by caffeine."

105.    When being interviewed for an ABC News article titled "Snooki Pushed Zantrex-3 Diet Pill, Docs Disapprove," Dr. Carl Lavie, Director of the Stress Testing Lab at John Oschner Heart and Vascular institute, stated that exercising while on Zantrex could be bad for the heart.  Dr. Lavie noted that, "[f]or young, healthy people, a small to modest dose of caffeine

---

[27] *See* http://clinicaltrials.gov/show/NCT01622101.

[28]  John Carey, *How Safe are Diet Supplements?*, BusinessWeek, Jan. 29, 2006, available at http://www.businessweek.com/stories/2006-01-29/how-safe-are-diet-supplements.

[29] *Can You Shed the Pounds by Swallowing a Pill?*, MSNBC Interactive, Nov. 22, 2005, available at http://www.today.com/id/10152879/#.UoKR8uL9U60.

should not be very risky, but even in young people, but more so in older with underlying heart disease, high doses of caffeine can cause a number of bad heart rhythm[s]."[30]

106.    Despite these health risks, Defendants recommend taking Zantrex-3 as follows: "As a pre-workout supplement, take two capsules 1 hour before exercise."  This recommendation is unsafe and dangerous.

107.    Even more alarming than the large amounts of caffeine found in Zantrex products is the fact that Fat Burner also contains an ingredient known as bitter orange.  Bitter orange has replaced ephedra, a supplement banned by the FDA in 2004 for its serious side effects on the heart.  However, bitter orange poses similar health risks as ephedrine because of its stimulant-like effects.  Among the many chemicals in bitter orange are synephrine and octopamine – chemicals similar to those in ephedra.  These chemicals, when combined with a stimulant such as caffeine – a popular combination in today's market – can lead to high blood pressure and increased heart rate in healthy adults with otherwise normal blood pressure.  Stroke and heart attack have been reported in some people using bitter orange alone or in combination with other stimulants such as caffeine.

108.    Unsurprisingly, there is no evidence to suggest that bitter orange is any safer than ephedra.  Rather, there is scientific evidence that demonstrates the risks of taking a caffeine and bitter orange cocktail prior to an exercise routine.

109.    A 2005 University of California study found that individuals taking only bitter orange experienced an increase in their heart rates.[31]  According to Dr. Christine Haller, a former Assistant Professor at the University of California San Francisco and leader of the 2005 study, there is certainly cause for alarm when bitter orange is taken together with caffeine.  Moreover, according to Professor Adam Myers, a physiology and biophysics professor at Georgetown

---

[30] Courtney Hutchison, *Snooki Pushed Zantrex-3 Diet Pill, Docs Disapprove* ABC News article, Sept. 28, 2011, available at http://abcnews.go.com/Health/Diet/snookis-zantrex-diet-pill-promo-poo-pooed-diet/story?id=14623421.

[31] Mary Duenwald, *Bitter Orange Under Scrutiny as the New* Ephedra, NY Times, Oct. 11, 2005, available at http://www.nytimes.com/2005/10/11/health/policy/11cons.html.

University Medical Center, "[t]here are no clinical studies that show [bitter orange] [i]s an effective weight loss agent."

110.    Even celebrity doctors such as Dr. Oz recommend against bitter orange. According to Dr. Oz, the supplement "can cause heart attack, stroke or even death.  Bitter orange contains a stimulant similar to ephedrine, banned by the FDA in 2004 after 2 people died and several suffered heart attacks or strokes."[32]

111.    Despite these health risks, Defendants recommend taking Fat Burner as follows: "As a pre-workout supplement, take two capsules 1 hour before exercise."

112.    The above-cited medical opinions are well-founded.  They predict the exact symptoms suffered by Ms. Cadillo and countless others who tried Defendants' unsafe Zantrex products.

**F.    Snooki's Marketing And Promotion Of Zantrex**

113.    Nicole Polizzi ("Polizzi" or "Snooki") is a public figure best known for her reality television appearances.  From 2009 through 2012, Snooki starred in the reality television series "Jersey Shore," chronicling the lives of eight housemates spending their summers at the Jersey Shore in New Jersey.  The series aired 71 episodes over six seasons, ending in December 2012. Since June 2012, Snooki has starred in "Snooki & JWoww," a spin-off reality series that has aired 26 episodes and is currently in its third season.  Snooki has also appeared on the reality show "Dancing with the Stars."

114.    Snooki is the principal endorser of Zantrex.  She appears in nearly every advertisement for the product and on Defendants' websites.  She also promotes Zantrex on Twitter, on Facebook, on YouTube, and in celebrity gossip magazines such as Star Magazine, Life & Style, Reality Weekly Magazine, and OK! Magazine.

---

[32] http://www.doctoroz.com/videos/three-supplements-dr-oz-would-never-take.

115.    In fact, Snooki is a paid spokesperson for Zantrex.  As shown below, she even confirmed this fact on her Twitter:  "One of my followers asked if I was a paid spokesperson for zantrex…yes haven't you seen the ads in Star?"



116.    Indeed, as Defendants' website shows, Snooki is the face of Zantrex:



117.    Until her receipt of Plaintiff's MMWA notice letter, Snooki's image adorned advertisements throughout the Zantrex website:

**(800) 898-5153**



ZANTREX-3 | ZANTREX FAT BURNER | ZANTREX POWER CRYSTALS | CONTACT US



# SNOOKI'S DIET SECRET!

## Another "CELEBRITY" caught cheating with controversial diet pill ZANTREX-3!!!

**We** all know that straight-shooting, hard-drinking party girl Nicole "Snooki" Polizzi of MTV's Jersey Shore fame has fought a long-running battle with her body weight. But lately, we've noticed that Snooki's looking a little leaner and in much better shape. The rumor mill has been giving credit to her new trainer. However, Snooki recently raised eyebrows after being caught outside her gym with a bottle of Zantrex Fat Burner, an "extreme energy" supplement popular among bodybuilders and college students. Until recently it was a little known fact that Snooki is a national spokesperson for Zantrex. Her association with Zantrex leaked out after she returned from Italy... a couple of dress sizes smaller... and people started asking questions. Oops!

### TWITTER BOMB!

Last month, Snooki tweeted a snapshot of herself looking busty and surprisingly thin in her bedroom mirror, and take a look at what's sitting on the dresser in the photo... yep, you guessed it, the familiar bright red bottle of Zantrex-3 Fat Burner. Ladies and gentlemen, we rest our case.

### FROM "BEFORE" TO "COVER GIRL"

Order Now!

## So what's Snooki's real weight-loss secret: The trainer, or the pills?

Our best guess is that it's a bit of both. Certainly, regular visits with a personal trainer are going to help, but it hardly seems insignificant that Snooks actually walks around with a bottle of Zantrex in her bag.

---

**56 Capsules**
**$39.99**

ORDER NOW

**Buy 2 Get 1 Free + Free Shipping!†**
Regular $126.47 — Now Only $79.98
You Save $46.49

ORDER NOW

**Bundle and Save!**
Order Zantrex-3 Fat Burner and Zantrex-3 Power Crystals and get an extra Box of Power Crystals absolutely FREE! (save $10 and get Free Shipping!)†
Regular $66.47, now only $49.98

ORDER NOW

## Zantrex-3 Fat Burner

**Rapid Fat Loss\* ▪ Incredible Energy\***

Zantrex-3 Fat Burner™\* provides the same high-energy component that the Zantrex brand is famous for, PLUS a clinically tested fat burner shown to encourage lipolysis (release of fat from mature cells) and inhibit the activity of phosphodiesterase\*. In other words, you lose body fat. Not just body weight, but actual body fat.\*

### DIRECTIONS:

To maximize fat loss, take two capsules in the morning and two capsules with your main meal, for a total of 4 capsules per day. Always take with a full glass of water. Do not exceed four capsules per day.

† Free standard shipping within the continental United States only. Canadian/International/Express orders are charged the appropriate shipping rates.

---

Enter your email to receive exclusive offers!    Submit

Because no product or program will work for everyone, all Zoller® Laboratories formulations are backed by our 100% money-back guarantee. Simply stated, if you are not satisfied with any Zoller Labs formulation just return it to the place of purchase within 30 days.

**NO QUESTIONS ASKED!**

\*These statements have not been evaluated by the Food and Drug Administration. These products are not intended to diagnose treat, cure or prevent any disease. Use in conjunction with any sensible diet and exercise program. Individual results will vary. All...



118.     And she even maintains several of her own personal website designed to promote and sell Zantrex.  One example is available at www.snookidance.com:



119.    Another example can be seen at www.snookislimsdown.com:



Learn More Now!     Order Zantrex-3 Fat Burner Now!     Snooki Caught Cheating?

See how New Jersey's favorite party girl is cutting the fat - not the fist-pumping.

Pint-size reality starlet Nicole "Snooki" Polizzi is getting even smaller. Before heading to Florence, Italy, to film the next season of Jersey Shore, the 23-year-old spent some time focusing on the G in GTL (gym, tan, laundry) — and in an exclusive interview with Star, she dishes about the killer workouts and healthy eating habits that have earned her a smokin' new bod.

"I've tried a lot of diets in the past, but I think I lacked motivation and determination," the 4'9" star admits, rattling off a laundry list of past weight-loss tactics. "If I didn't lose a couple pounds in a week, I said 'Screw it.'"

And she did. After a summer of booze and fried pickles in Seaside Heights, N.J., the former 100-lb. cheerleader ballooned to 126 lbs. "After being on TV, I saw myself and I was like, Whoa!" Snooki says while shuddering at the image of her former self. "If I was stretched out, I'd look like a supermodel. But I'm compact, so I look like I'm 160."

To shed the unwanted weight, the self-proclaimed Princess of Poughkeepsie enlisted the help of a trainer in New York City. But the commute from upstate became too taxing, so she decided to take matters into her own hands. "I do at least an hour of cardio, and then I probably do 2,000 crunches," she says. "I also work my butt with the exercise balls and do strength training." While her routine may seem tame for a Guidette who prides herself on outrageous antics, rest assured, Snooki has plans to spice up her workout in the future. "I want to try pole-dancing

classes," she says with a smile.

For motivation, Snooki listens to a mix of alternative rock and house music on her iPod and fantasizes about her future bikini body. "It's kind of motivating when you're on the treadmill and you're like, 'Yeah, I'm going to get this great body for summer!'" she says.

In addition to an intense workout routine and a diet consisting mostly of salads and grilled chicken, Snooki credits her physical transformation to Zantrex-3 Fat Burner, a supplement she takes before hitting the gym. "I wanted something that gave me energy to work out," she says. "I was scared it was going to make me feel shaky, but it doesn't at all."

She also says the supplement helps to curb her ravenous appetite. Once

Snooki credits Zantrex-3 Fat Burner for her sexy new body!

known for indulging in late-night grilled-cheese sandwiches, Snooki now avoids eating after 7 p.m. and has eliminated chips and candy from her diet. "My new favorite snacks are rice cakes with peanut butter, but I don't eat a lot of peanut butter because it goes to my ass," she laughs. "If I drink alcohol, it's only vodka seltzer."

At 109 lbs., Snooki boasts not only a more svelte figure but also a new outlook on life. "I'm ready to grow up," she says. The proof? Snooki insists she'll spend most of her time in Italy sightseeing and visiting museums — and fist-pump in moderation. "Even though I'm not going to be a slob and drink all the time, it doesn't mean that I'm not going to be myself," she says. "I'm just not going to be blacked out and arrested."

- JENNIFER KAMM *



Despite the temptation of pasta and gelato, Snooki plans to stick with her diet while in Italy. "I'll have a little serving and then hit the gym that much harder," she says

120.    Moreover, Snooki regularly tweets about Zantrex on Twitter.  As a reality television star, Snooki's two Twitter accounts – "Snooki" and "SnookiSense."  With her main "Snooki" account, Snooki had made over made over 18,000 tweets and attracted over 6.4 million followers.  With her secondary "SnookiSense" account, she has made over 93,000 tweets and attracted 11,500 followers.



121.    Snooki holds herself out as an expert on fitness.  In this regard, she has amassed many fans and followers who specifically admire and listen to her advice on weight loss and fitness.  For example, as shown below, she posts weekly "Workout Wednesday" videos online at http://www.celebuzz.com/nicole-snooki-polizzi/2013/05/introducing-workout-wednesday/.



122.    Snooki publicly credits Zantrex for her weight loss on Twitter:



123.    As indicated by Star Magazine's and Snooki's May 27, 2011 Facebook and Twitter posts, reproduced below, Snooki gave an interview to Star Magazine and once again credits Zantrex for her weight loss.



124.    The Star Magazine article written by Jennifer Kamm states:  "In addition to an intense workout routine and a diet consisting mostly of salads and grilled chicken, Snooki credits her physical transformation to Fat Burner, a supplement she takes before hitting the gym.  'I wanted something that gave me energy to work out,' she says.  'I was scared it was going to make me feel shaky, but it doesn't at all.'  She also says the supplement helps to curb her ravenous appetite."

125.    As shown below, Snooki endorsed Fat Burner in "OK!'s Diet Confessions With Nicole 'Snooki' Polizzi" available at http://okmagazine.com/live-big/oks-diet-confessions-nicole-snooki-polizzi/.

My Top Diet Tip Is…

"You need to stay motivated. Zantrex-3 Fat Burner helps me see results and keeps me motivated. I used to get discouraged if I didn't see results immediately — but don't [you] give up!"

126.    To date, Snooki has appeared in Zantrex commercials at least twice.  The first was titled titled "Snooki Shares Her Secret:"



127.    On January 20, 2012, Snooki appeared in a second commercial titled "Jersey Shore's Snooki Dancing – www.Zantrex3.com:"



128.    As shown below, Snooki regularly tweets to her "Tweedos" to advise them of retailers who have Zantrex either on sale or in stock.



129.   Snooki claims she no longer uses Zantrex because she is breastfeeding her child. But she continues to pitch the product on Twitter and elsewhere:



130.   Snooki represents on websites, in print media, and in social media that Zantrex is safe and effective for weight loss and fat loss.  These representations are false, misleading, and deceptive because, as shown above, Zantrex is neither effective nor safe for weight loss or fat loss.

## CLASS REPRESENTATION ALLEGATIONS

131.   Ms. Brady seeks to represent a class defined as all persons in the United States who purchased Zantrex-3 and/or Power Crystals (the "Zantrex-3 Class").  Excluded from the Zantrex-3 Class are persons who made such purchase for purpose of resale.

132.   Ms. Brady also seeks to represent a subclass of all Zantrex-3 Class members who purchased Zantrex-3 and/or Power Crystals in the state of New York (the "New York Subclass").

133.   Ms. Dalli Cardillo seeks to represent a class defined as all persons in the United States who purchased Fat Burner (the "Fat Burner Class").  Excluded from the Fat Burner Class are persons who made such purchase for purpose of resale.

134.   Ms. Dalli Cardillo also seeks to represent a subclass of all Fat Burner Class members who purchased Fat Burner in the state of Maryland (the "Maryland Subclass").

135.   Members of the Classes are so numerous that their individual joinder herein is impracticable.  On information and belief, members of the Classes number in the millions.  The precise number of Class members and their identities are unknown to Plaintiffs at this time but may be determined through discovery.  Class members may be notified of the pendency of this

action by mail and/or publication through the distribution records of Defendants and third party retailers and vendors.

136.    Common questions of law and fact exist as to all Class members and predominate over questions affecting only individual Class members.  Common legal and factual questions include, but are not limited to whether Defendants' labeling, marketing and promotion of the Zantrex products is false and misleading.

137.    The claims of the named Plaintiffs are typical of the claims of the Classes in that the named Plaintiffs were exposed to Defendants' false and misleading marketing and promotional materials and representations, purchased Zantrex, and suffered a loss as a result of that purchase.

138.    Plaintiffs are adequate representatives of the Classes because their interests do not conflict with the interests of the Class members they seek to represent, they have retained competent counsel experienced in prosecuting class actions, and they intend to prosecute this action vigorously.  The interests of Class members will be fairly and adequately protected by Plaintiffs and their counsel.

139.    The class mechanism is superior to other available means for the fair and efficient adjudication of the claims of Class members.  Each individual Class member may lack the resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish Defendants' liability.  Individualized litigation increases the delay and expense to all parties and multiplies the burden on the judicial system presented by the complex legal and factual issues of this case.  Individualized litigation also presents a potential for inconsistent or contradictory judgments.  In contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court on the issue of Defendants' liability.  Class treatment of the liability issues will ensure that all claims and claimants are before this Court for consistent adjudication of the liability issues.

## COUNT I

### (Magnuson-Moss Warranty Act, 15 U.S.C. §§ 2301, *et seq.*)

140.     Plaintiffs incorporate by reference and re-allege each and every allegation set forth above as though fully set forth herein.

141.     Plaintiffs bring this claim individually and on behalf of members of all Classes and Subclasses against all Defendants.

142.     Zantrex products are consumer products as defined in 15 U.S.C. § 2301(1).

143.     Plaintiffs and Class members are consumers as defined in 15 U.S.C. § 2301(3).

144.     Defendants are suppliers and warrantors as defined in 15 U.S.C. § 2301(4) and (5).

145.     In connection with the sale of the Zantrex-3, Defendants issued written warranties as defined in 15 U.S.C. § 2301(6), by representing that it would provide consumers with "Rapid Weight Loss" and "456% More Weight Loss Than America's # 1 selling Ephedra-Based Diet Pill," "in a little over 6 weeks" of use, "**WITHOUT** diet and exercise" on the product's packaging.

146.     In connection with the sale of the Power Crystals, Defendants issued written warranties as defined in 15 U.S.C. § 2301(6), by representing that it would provide consumers with "Rapid Weight Loss" on the product's packaging.

147.     In connection with the sale of Fat Burner, Defendants issued written warranties as defined in 15 U.S.C. § 2301(6), by representing that it is a "Fat Burner" that will provide consumers with "Rapid Fat Loss" on the product's packaging, and that it is effective for "weight loss," and is "a clinically-tested fat burner shown to encourage lipolysis (release of fat from mature cells) and inhibit the activity of phosphodiesterase.  In other words, you lose body fat. Not just body weight, but actual body fat," in magazine advertisements, on the internet, and in point-of-purchase advertisements.

148.     In fact, each of the Zantrex products do not conform to the above-referenced representations because they are false and misleading.  Indeed, competent and reliable scientific evidence proves that each representation is false.

149.     By reason of Defendants' breach of warranties, Defendants violated the statutory rights due to Plaintiffs and Class members pursuant to the Magnuson-Moss Warranty Act, 15 U.S.C. §§ 2301, *et seq.*, thereby damaging Plaintiffs and Class members.

150.     Plaintiffs and Class members were injured as a direct and proximate result of Defendants' breach because they would not have purchased Zantrex products if the true facts had been known concerning its safety and efficacy.

## COUNT II

### (Breach Of Express Warranty)

151.     Plaintiffs incorporate by reference and re-allege each and every allegation set forth above as though fully set forth herein.

152.     Plaintiffs bring this claim individually and on behalf of members of all Classes and Subclasses against all Defendants.

153.     In connection with the sale of the Zantrex-3, Defendants, as the designers, manufacturers, marketers, distributors, and/or sellers issued written warranties by representing that it would provide consumers with "Rapid Weight Loss" and "456% More Weight Loss Than America's # 1 selling Ephedra-Based Diet Pill," "in a little over 6 weeks" of use, "**WITHOUT** diet and exercise" on the product's packaging.

154.     In connection with the sale of the Power Crystals, Defendants, as the designers, manufacturers, marketers, distributors, and/or sellers issued written warranties by representing that it would provide consumers with "Rapid Weight Loss" on the product's packaging.

155.     In connection with the sale of Fat Burner, Defendants, as the designers, manufacturers, marketers, distributors, and/or sellers issued written warranties by representing that it is a "Fat Burner" that will provide consumers with "Rapid Fat Loss" on the product's packaging, and that it is effective for "weight loss," and is "a clinically-tested fat burner shown to encourage lipolysis (release of fat from mature cells) and inhibit the activity of phosphodiesterase.  In other words, you lose body fat.  Not just body weight, but actual body fat," in magazine advertisements, on the internet, and in point-of-purchase advertisements.

156.     Each of these warranties is false and misleading, as proven by competent and reliable scientific evidence, as detailed above.

157.     Plaintiffs and Class members were injured as a direct and proximate result of Defendants' breaches because they would not have purchased Zantrex products if the true facts concerning their safety and efficacy had been known.

## COUNT III

### (Deceptive Acts Or Practices, New York Gen. Bus. Law § 349)

158.     Ms. Brady incorporates by reference and re-alleges each and every allegation set forth above as though fully set forth herein.

159.     Ms. Brady brings this claim individually and on behalf of members of the New York Subclass against all Defendants.

160.     By the acts and conduct alleged herein, Defendants committed unfair or deceptive acts and practices by making false representations about Zantrex.  *See supra* ¶¶ 153-54.

161.     The foregoing deceptive acts and practices were directed at consumers.

162.     The foregoing deceptive acts and practices are misleading in a material way because they fundamentally misrepresent the safety and efficacy of Zantrex products to induce consumers to purchase those products.

163.     Ms. Brady and members of the New York Subclass were injured as a result because they paid for Zantrex products, which they would not have purchased had they known the true facts.

164.     On behalf of herself and other members of the New York Subclass, Ms. Brady seeks to enjoin the unlawful acts and practices described herein, to recover her actual damages or fifty dollars, whichever is greater, three times actual damages, and reasonable attorneys' fees.

## COUNT IV

### (Negligent Misrepresentation)

165.     Plaintiffs incorporate by reference and re-allege each and every allegation set forth above as though fully set forth herein.

166.     Plaintiffs bring this claim individually and on behalf of members of all Classes and Subclasses against all Defendants.

167.     As discussed above, Defendants made misrepresentations and failed to disclose that Zantrex is ineffective and worthless.  *See supra* ¶¶ 153-55.  Defendants had a duty to disclose this information.

168.     At the time Defendants made these misrepresentations, Defendants knew or should have known that these representations were false or made them without knowledge of their truth or veracity.

169.     At an absolute minimum, Defendants negligently misrepresented and/or negligently omitted material facts about Zantrex products.

170.     The negligent misrepresentations and omissions made by Defendant, upon which Plaintiffs and Class and New York Subclass members reasonably and justifiably relied, were intended to induce and actually induced Plaintiffs and Class members to purchase Zantrex.

171.     Plaintiffs and Class members would not have purchased Zantrex if the true facts had been known.

## COUNT V

### (Fraud)

172.     Plaintiffs incorporate by reference and re-allege each and every allegation set forth above as though fully set forth herein.

173.     Plaintiffs bring this claim individually and on behalf of members of all Classes and Subclasses against all Defendants.

174.     As discussed above, Defendants made misrepresentations and failed to disclose that Zantrex is ineffective and worthless.  *See supra* ¶¶ 153-55.  Defendants had a duty to disclose this information.

175.     The misrepresentations and omissions were made with knowledge of their falsehood.

176. The misrepresentations and omissions made by Defendant, upon which Plaintiffs and Class members reasonably and justifiably relied, were intended to induce and actually induced Plaintiffs and Class members to purchase Zantrex.

177. The fraudulent actions of Defendants caused damage to Plaintiffs and Class members, who are entitled to damages and other legal and equitable relief as a result.

## COUNT VI

### (Unjust Enrichment)

178. Plaintiffs incorporate by reference and re-allege each and every allegation set forth above as though fully set forth herein.

179. Plaintiffs bring this claim individually and on behalf of members of all Classes and Subclasses against all Defendants.

180. Plaintiffs and Class members conferred benefits on Defendants by purchasing Zantrex.

181. Defendants have knowledge of such benefits.

182. Defendants have been unjustly enriched in retaining the revenues derived from Plaintiffs and Class members' purchases of Zantrex. Retention of those moneys under these circumstances is unjust and inequitable because Defendants misrepresented that Zantrex was a safe and effective treatment for weight loss when in fact it was ineffective and worthless, which caused injuries to Plaintiffs and Class members because they would not have purchased Zantrex if the true facts had been known.

183. Because Defendants' retention of the non-gratuitous benefits conferred on it by Plaintiffs and Class members is unjust and inequitable, Defendants must pay restitution to Plaintiffs and the Class members for their unjust enrichment, as ordered by the Court.

## COUNT VI

### (Violation of the Maryland Consumer Protection Act)

184. Ms. Dalli Cardillo incorporates by reference and re-alleges each and every allegation set forth above as though fully set forth herein.

185.    Ms. Dalli Cardillo brings this claim individually and on behalf of members of the Maryland Subclass against all Defendants.

186.    Ms. Dalli Cardillo is a consumer within the meaning of the Maryland Consumer Protection Act ("MCPA") and MD. Code Ann., Commercial Law § 13-101, *et seq.*

187.    The Zantrex products are consumer goods within the meaning of the MCPA.

188.    The MCPA prohibits the use of any "unfair or deceptive trade practice" in the sale or lease of any consumer good.

189.    By the acts and conduct alleged herein, Defendants committed unfair or deceptive acts and practices by making false representations about Zantrex.  *See supra* ¶¶ 153-55.

190.    The foregoing deceptive acts and practices were directed at consumers.

191.    The foregoing deceptive acts and practices are misleading in a material way because they fundamentally misrepresent the safety and efficacy of Zantrex products to induce consumers to purchase those products.

192.    The Defendants intended that Ms. Dalli Cardillo and Maryland Subclass members would rely on their representations, which occurred in the course of conduct involving trade and commerce.

193.    Ms. Dalli Cardillo and members of the Maryland Subclass were injured as a result because they paid for Zantrex products, which they would not have purchased had they known the true facts.

194.    On behalf of herself and members of the Maryland Subclass, Ms. Dalli Cardillo seeks to recover damages, reasonable attorneys' fees and costs, and expert expenses as a result of the Defendants' violations of the MCPA.

## **RELIEF DEMANDED**

195.    WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, seek judgment against Defendants, as follows:

    a.    For an order certifying the nationwide Classes and the New York and Maryland Subclasses under Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiffs as representatives of the Classes and

Subclasses and Plaintiffs' attorneys as Class Counsel to represent the Class and Subclass members;

b.  For an order declaring that Defendants' conduct violates the statutes referenced herein;

c.  For an order finding in favor of Plaintiffs, the nationwide Classes, and the New York and Maryland Subclass on all counts asserted herein;

d.  For compensatory and punitive damages in amounts to be determined by the Court and/or jury;

e.  For prejudgment interest on all amounts awarded;

f.  For an order of restitution and all other forms of equitable monetary relief;

g.  For injunctive relief as pleaded or as the Court may deem proper; and

h.  For an order awarding Plaintiffs and the Classes and Subclasses their reasonable attorneys' fees and expenses and costs of suit.

## JURY TRIAL DEMANDED

Plaintiffs demand a trial by jury on all claims so triable.

Dated:  April 10, 2014                        Respectfully submitted,

**BURSOR & FISHER, P.A.**

By: _____
Scott A. Bursor

Scott A. Bursor (SB1141)
Joseph I. Marchese (JM1976)
Yitzchak Kopel (YK5522)
Neal J. Deckant (ND1984)
888 Seventh Avenue
New York, NY 10019
Tel:  (212) 989-9113
Fax: (212) 989-9163
E-Mail:  scott@bursor.com
         jmarchese@bursor.com
         ykopel@bursor.com
         ndeckant@bursor.com

**LEVI & KORSINSKY LLP**
Shane T. Rowley
30 Broad Street, 24th Floor
New York, NY 10004

Tel: (212) 363-7500
Fax: (212) 363-7171
E-Mail:  srowley@zlk.com

*Attorneys for Plaintiffs*

**EXHIBIT A**

# BURSOR & FISHER

P.A.

888 SEVENTH AVENUE
NEW YORK, NY 10019
www.bursor.com

JOSEPH I. MARCHESE
Tel: 646.837.7410
Fax: 212.989.9163
jmarchese@bursor.com

September 23, 2013

*Via Certified Mail - Return Receipt Requested*

Basic Research, L.L.C.
5742 Harold Gatty Drive
Salt Lake City, UT  84116

Zoller Laboratories, L.L.C.
5742 Harold Gatty Drive
Salt Lake City, UT  84116

Nicole E. Polizzi aka "Snooki"
21 Wygant Road
Marlboro, NY  12542

Re:     Violation of Magnuson-Moss Warranty Act and other applicable laws

This letter serves as a notice and demand for corrective action on behalf of our client, Ashley Brady, and all other persons similarly situated, arising from breaches of warranty under the Magnuson-Moss Warranty Act. This letter also serves as notice pursuant to N.Y. U.C.C. LAW § 2--607(3)(a) concerning the breaches of express and implied warranties described herein.

You have participated in the marketing and sale of Zantrex-3, Zantrex-3 Fat Burner, and Zantrex-3 Power Crystals (collectively, "Zantrex") as over-the-counter weight loss drugs.  The labels for Zantrex claim it is safe and effective for "rapid weight loss," provides "extreme energy," delivers "546% more weight loss than the leading ephedra-based diet pill," and causes "reduced appetite," "increased concentration," "increased alertness," and "increased performance."  Each of these representations is false and misleading.  Zantrex is not, in fact, effective for weight control.

Furthermore, with respect to caffeine, the active ingredient, the FDA has determined that "there are inadequate data to establish the general recognition of the safety and effectiveness" of caffeine for the specified use of weight control.  *See* 21 C.F.R. § 310.545(20).

Ms. Brady purchased Zantrex based on representations on the package, label, and in other marketing and advertising materials which state, among other things, that the product was safe and effective for weight loss.  She would not have purchased Zantrex if she had known that it is not safe or effective for weight loss.

Ms. Brady is acting on behalf of a class defined as all persons in the United States who purchased Zantrex, and a subclass of persons who purchased Zantrex in the State of New York.

To cure these defects, we demand that you (1) cease and desist from further sales of Zantrex; (2) issue an immediate recall of Zantrex; (3) remove the false and misleading claims from Zantrex's label; (4) cease making false and misleading claims in Zantrex's advertising; and (5) make full restitution to all purchasers of Zantrex of all purchase money obtained from sales thereof.

We further demand that you preserve all documents and other evidence which refer or relate to any of the above-described practices including, but not limited to, the following:

1.      All documents concerning the design, development, and/or testing of Zantrex;

2.      All documents concerning the advertisement, marketing, or sale of Zantrex;

3.      All documents concerning communications with any retailer involved in the marketing or sale of Zantrex;

4.      All documents concerning communications with purchasers of Zantrex, including but not limited to customer complaints related to its failure to reduce weight or body fat; and

5.      All documents concerning the total revenue derived from sales of Zantrex in the United States.

We are willing to negotiate to attempt to resolve the demands asserted in this letter.  If you wish to enter into such discussions, please contact me immediately.  If I do not hear from you promptly, I will conclude that you are not interested in resolving this dispute short of litigation.

If you contend that any statement in this letter is inaccurate in any respect, please provide us with your contentions and supporting documents promptly.

Very truly yours,

Joseph I. Marchese

# BURSOR & FISHER
P.A.

888 SEVENTH AVENUE
NEW YORK, NY 10019
www.bursor.com

JOSEPH I. MARCHESE
Tel: 646.837.7410
Fax: 212.989.9163
jmarchese@bursor.com

November 21, 2013

_**Via Certified Mail - Return Receipt Requested**_

Dennis W. Gay
Basic Research, L.L.C.
5742 Harold Gatty Drive
Salt Lake City, UT  84116

Daniel B. Mowrey
Basic Research, L.L.C.
5742 Harold Gatty Drive
Salt Lake City, UT  84116

Mitchell K. Friedlander
Basic Research, L.L.C.
5742 Harold Gatty Drive
Salt Lake City, UT  84116

Re:      Violation of Magnuson-Moss Warranty Act and other applicable laws

This letter serves as a notice and demand for corrective action on behalf of our client, Ashley Brady, and all other persons similarly situated, arising from breaches of warranty under the Magnuson-Moss Warranty Act. This letter also serves as notice pursuant to N.Y. U.C.C. LAW § 2--607(3)(a) concerning the breaches of express and implied warranties described herein.

You have participated in the marketing and sale of Zantrex-3, Zantrex-3 Fat Burner, and Zantrex-3 Power Crystals (collectively, "Zantrex") as over-the-counter weight loss drugs.  The labels for Zantrex claim it is safe and effective for "rapid weight loss," provides "extreme energy," delivers "546% more weight loss than the leading ephedra-based diet pill," and causes "reduced appetite," "increased concentration," "increased alertness," and "increased performance."  Each of these representations is false and misleading.  Zantrex is not, in fact, effective for weight control.

Furthermore, with respect to caffeine, the active ingredient, the FDA has determined that "there are inadequate data to establish the general recognition of the safety and effectiveness" of caffeine for the specified use of weight control.  _See_ 21 C.F.R. § 310.545(20).

Ms. Brady purchased Zantrex based on representations on the package, label, and in other marketing and advertising materials which state, among other things, that the product was safe

and effective for weight loss.  She would not have purchased Zantrex if she had known that it is not safe or effective for weight loss.

Ms. Brady is acting on behalf of a class defined as all persons in the United States who purchased Zantrex, and a subclass of persons who purchased Zantrex in the State of New York.

To cure these defects, we demand that you (1) cease and desist from further sales of Zantrex; (2) issue an immediate recall of Zantrex; (3) remove the false and misleading claims from Zantrex's label; (4) cease making false and misleading claims in Zantrex's advertising; and (5) make full restitution to all purchasers of Zantrex of all purchase money obtained from sales thereof.

We further demand that you preserve all documents and other evidence which refer or relate to any of the above-described practices including, but not limited to, the following:

1.    All documents concerning the design, development, and/or testing of Zantrex;

2.    All documents concerning the advertisement, marketing, or sale of Zantrex;

3.    All documents concerning communications with any retailer involved in the marketing or sale of Zantrex;

4.    All documents concerning communications with purchasers of Zantrex, including but not limited to customer complaints related to its failure to reduce weight or body fat; and

5.    All documents concerning the total revenue derived from sales of Zantrex in the United States.

We are willing to negotiate to attempt to resolve the demands asserted in this letter.  If you wish to enter into such discussions, please contact me immediately.  If I do not hear from you promptly, I will conclude that you are not interested in resolving this dispute short of litigation.

If you contend that any statement in this letter is inaccurate in any respect, please provide us with your contentions and supporting documents promptly.

Very truly yours,

Joseph I. Marchese

**EXHIBIT B**

## Cover Sheet for Civil Actions

**Interpretation.** If you do not speak or understand English, contact the court at least 3 days before the hearing or mediation, and an interpreter will be provided.

**Interpretación.** Si usted no habla o entiende el Inglés contacte al tribunal por lo menos 3 días antes de la audiencia o mediación y le proveerán un intérprete.

**Plaintiff/Petitioner** (First)

Basic Research, LLC
_Name_

_Address_

Salt Lake City, Utah
_City, State, Zip_

_Phone_ _Email_

First **Plaintiff/Petitioner's Attorney***

Jason M. Kerr
_Name_

8222
_Bar Number_

--------------------------------------------------------------

**Plaintiff/Petitioner** (Second)

Zoller Laboratories, LLC
_Name_

_Address_

Salt Lake City, Utah
_City, State, Zip_

_Phone_ _Email_

**Second Plaintiff/Petitioner's Attorney***

_Name_

_Bar Number_

**Defendant/Respondent** (First)

Joseph Marchese
_Name_

_Address_

_City, State, Zip_

_Phone_ _Email_

First **Defendant/Respondent's Attorney***

_Name_

_Bar Number_

--------------------------------------------------------------

**Defendant/Respondent** (Second)

Bursor & Fisher
_Name_

888 Seventh Avenue
_Address_

New York, NY 10019
_City, State, Zip_

646-837-7410
_Phone_ _Email_

**Second Defendant/Respondent's Attorney***

_Name_

_Bar Number_

*Attorney mailing and email addresses provided by Utah State Bar.

---

**Total Claim for Damages $**_____ **Jury Demand** ☐ Yes ☒ No $250 ☐ Jury Demand

**Schedule of Fees: §78a-2-301** (Choose ☒ all that apply. See Page 2 for fees for claims other than claims for damages.)

| | |
|---|---|
| **PLEASE CHOOSE ONE BEFORE PROCEEDING:** | $180 ☐ Damages $10,000 & over |
| ☐ No monetary damages are requested/ Damages Unspecified (URCP 26: Tier 2) | — — COMPLAINT OR INTERPLEADER — — |
| ☒ Damages requested are $50,000 or less (URCP 26: Tier 1) | $75 ☐ Damages $2000 or less |
| ☐ Damages requested are more than $50,000 and less than $300,000 (URCP 26: Tier 2) | $185 ☐ Damages $2001 - $9999 |
| ☐ Damages requested are $300,000 or more (URCP 26: Tier 3) | $360 ☐ Damages $10,000 & over |
| ☐ This case is exempt from URCP 26. (E) | $360 ☐ Damages Unspecified |

— — COUNTERCLAIM, CROSS CLAIM, THIRD PARTY CLAIM, OR INTERVENTION — —

$55 ☐ Damages $2000 or less

$150 ☐ Damages $2001 - $9999

$155 ☐ Damages $10,000 & over

— — MOTION TO RENEW JUDGMENT — —

$37.50 ☐ Damages $2000 or less

$92.50 ☐ Damages $2001 - $9,999

## Choose ☒ Only One Category

| Fee | | Case Type |
|---|---|---|
| | | **— — — — APPEALS — — — —** |
| $360 | ☐ | Administrative Agency Review |
| Sch | ☐ | Tax Court (Appeal of Tax Commission Decision) Court: Refer to Clerk of Court upon filing. |
| $225 | ☐ | Civil (78A-2-301(1)(h)) (E) |
| $225 | ☐ | Small Claims Trial de Novo (E) |
| | | **— — — GENERAL CIVIL — — —** |
| $360 | ☐ | Attorney Discipline (T2) |
| Sch | ☐ | Civil Rights |
| $0 | ☐ | Civil Stalking (E) |
| $360 | ☐ | Condemnation/Eminent Domain |
| Sch | ☐ | Contract |
| Sch | ☐ | Debt Collection |
| Sch | ☐ | Eviction/Forcible Entry and Detainer (E) |
| $360 | ☐ | Extraordinary Relief/Writs |
| $360 | ☐ | Forfeiture of Property (E) |
| Sch | ☐ | Interpleader |
| Sch | ☐ | Lien/Mortgage Foreclosure |
| Sch | ☐ | Malpractice |
| Sch | ☒ | Miscellaneous Civil |
| Sch | ☐ | Personal Injury |
| $360 | ☐ | Post Conviction Relief: Capital (E) |
| $360 | ☐ | Post Conviction Relief: Non-capital (E) |
| Sch | ☐ | Property Damage |
| Sch | ☐ | Property Rights |
| Sch | ☐ | Sexual Harassment |
| Sch | ☐ | Water Rights |
| Sch | ☐ | Wrongful Death |
| $360 | ☐ | Wrongful Lien |
| Sch | ☐ | Wrongful Termination |
| | | **— — — — DOMESTIC — — — —** |
| $0 | ☐ | Cohabitant Abuse (E) |
| $310 | ☐ | Marriage Adjudication (Common Law) (T2) |
| $310 | ☐ | Custody/Visitation/ Support (T2) |
| $310 | ☐ | Divorce/Annulment (T2) |
| | ☐ | Check if child support, custody or parent-time will be part of decree |
| | ☐ | Check if Temporary Separation filed |
| $8 | ☐ | Vital Statistics §26-2-25 per form |
| $115 | ☐ | Counterclaim: Divorce/Sep. Maint. |
| $115 | ☐ | Counterclaim: Custody/Visitation/ Support |
| $155 | ☐ | Counterclaim: Paternity/Grandparent Visitation |

| Fee | | Case Type |
|---|---|---|
| $100 | ☐ | Domestic Modification (T2) |
| $100 | ☐ | Counter-petition: Domestic Modification |
| $360 | ☐ | Grandparent Visitation (T2) |
| $360 | ☐ | Paternity/Parentage (T2) |
| $310 | ☐ | Separate Maintenance (T2) |
| $35 | ☐ | Temporary Separation (E) |
| $35 | ☐ | Uniform Child Custody Jurisdiction & Enforcement Act (UCCJEA) (E) |
| $35 | ☐ | Uniform Interstate Family Support Act (UIFSA) (E) |
| | | **— — — — JUDGMENTS — — — —** |
| $35 | ☐ | Foreign Judgment (Abstract of) (E) |
| $50 | ☐ | Abstract of Judgment/Order of Utah Court/Agency (E) |
| $30 | ☐ | Abstract of Judgment/Order of Utah State Tax Commission (E) |
| $35 | ☐ | Judgment by Confession (E) |
| | | **— — — — PROBATE — — — —** |
| $360 | ☐ | Adoption/Foreign Adoption (T2) |
| $8 | ☐ | Vital Statistics §26-2-25 per form |
| $360 | ☐ | Conservatorship (T2) |
| $360 | ☐ | Estate Personal Rep – Formal (T2) |
| $360 | ☐ | Estate Personal Rep – Informal (T2) |
| $35 | ☐ | Foreign Probate/Child Custody Doc. (E) |
| $360 | ☐ | Gestational Agreement (T2) |
| $360 | ☐ | Guardianship (T2) |
| $0 | ☐ | Involuntary Commitment (T2) |
| $360 | ☐ | Minor's Settlement (T2) |
| $360 | ☐ | Name Change (T2) |
| $360 | ☐ | Supervised Administration (T2) |
| $360 | ☐ | Trusts (T2) |
| $360 | ☐ | Unspecified (Other) Probate (T2) |
| | | **— — — SPECIAL MATTERS — — —** |
| $35 | ☐ | Arbitration Award (E) |
| $0 | ☐ | Determination Competency-Criminal (E) |
| $135 | ☐ | Expungement (E) |
| $0 | ☐ | Hospital Lien (E) |
| $35 | ☐ | Judicial Approval of Document: Not Part of Pending Case (E) |
| $35 | ☐ | Notice of Deposition in Out-of-State Case/Foreign Subpoena (E) |
| $35 | ☐ | Open Sealed Record (E) |

(E) Exempt from URCP Rule 26
(T2) Case type defaults to Tier 2 (no monetary damages)

Ronald F. Price (5535)
Jason M. Kerr (8222)
PRICE PARKINSON & KERR, PLLC
5742 West Harold Gatty Drive
Salt Lake City, UT  84116
Telephone:  (801) 530-2900
E-mail: ronprice@ppktrial.com
            jasonkerr@ppktrial.com

Attorneys for Plaintiffs

---

## IN THE THIRD JUDICIAL DISTRICT COURT, SALT LAKE DEPARTMENT
## SALT LAKE COUNTY, STATE OF UTAH

| | |
|---|---|
| **BASIC RESEARCH, LLC, a Utah limited liability company and ZOLLER LABORATORIES, LLC, a Utah limited liability company,**<br><br>Plaintiffs,<br><br>-vs-<br><br>**JOSEPH MARCHESE, an individual, and BURSOR & FISHER P.A., a Florida corporation,**<br><br>Defendants. | **COMPLAINT**<br><br>Civil No. _____<br><br>Judge _____ |

Plaintiffs Basic Research, LLC ("Basic") and Zoller Laboratories, LLC ("Zoller") (Basic and Zoller are sometimes hereinafter collectively referred to as "Plaintiffs"), for causes of action against defendants, complain and allege as follows:

### Introduction

This action is brought to recover damages caused by defendants' disparagement of Plaintiffs and several consumer products manufactured, distributed, advertised and sold by Plaintiffs.  Zoller has developed significant goodwill and a strong reputation in the nutritional supplement industry by developing, marketing and selling effective products, including the

1

following products: (1) Zantrex-3 (hereinafter "Zantrex-3"), which is a nutritional supplement designed to promote energy and weight loss; (2) Zantrex-3 High Energy Fat Burner (hereinafter "Fat Burner"), which is a nutritional supplement designed to promote energy and preferential fat loss; and (3) Zantrex-3 Power Crystals (hereinafter "Power Crystals"), which is a nutritional supplement designed to promote energy and weight loss.  Zantrex-3, Fat Burner and Power Crystals are hereinafter sometimes referred to as the "Products".  Basic Research is the exclusive distributor of the Products.

Plaintiffs have spent millions of dollars developing, manufacturing, and marketing the Products.  Scientific evidence supports the claims Zoller makes about its Products.  Plaintiffs' customers keep buying the Products because they work.  Now, defendants are damaging Plaintiffs' hard-earned goodwill by disparaging Plaintiffs and the Products, by making and publishing false and defamatory statements about the Products.  In particular, Defendants sent a letter to Nicole E. Polizzi (a well-known celebrity also known as "Snooki") in which defendants disparage and defame Plaintiffs and the Products.  Defendants' defamatory and disparaging statements have caused damages to Plaintiffs for which Plaintiffs now seek to recover through this action.

### The Parties

1.      Basic is a Utah limited liability company with its principal place of business located in Salt Lake County, Utah.

2.      Zoller is a Utah limited liability company with its principal place of business located in Salt Lake County, Utah.

3.      Defendant Bursor & Fisher P.A. (the "Law Firm") is, upon information and belief, a Florida corporation with offices located in Florida, New York and California.

2

4.      Defendant Joseph Marchese ("Marchese") is an individual who, upon information and belief, resides in the State of New York.  Marchese and the Law Firm are sometimes hereinafter collectively referred to as "Defendants".

5.      Marchese is an attorney licensed to practice law in the State of New York and, upon information and belief, is employed by the Law Firm.

6.      Upon information and belief, a least a portion of Defendants' business involves soliciting clients in order to file class action lawsuits against companies such as Plaintiffs, alleging that the companies have engaged in false advertising or other wrongful conduct.

## Jurisdiction and Venue

7.      This Court has jurisdiction pursuant to Utah Code Ann. § 78A-5-102(1).

8.      Venue is proper pursuant to Utah Code Ann. §§ 78B-3-306 78B-3-307.

## Factual Allegations

9.      Zoller manufactures and sells the Products.

10.     Basic is the exclusive distributor of the Products. Ms. Polizzi is an independent third party who has no ownership interest in or control over Plaintiffs.

11.     Ms. Polizzi previously entered into an endorsement contract with Zoller pursuant to which she endorsed the Zantrex-3 product; however, that endorsement contract expired some time ago.

12.     Apart from her now expired endorsement contract with Zoller, Ms. Polizzi has no involvement with Plaintiffs.

13.     A growing "industry" amongst a certain sector of the legal community is the creation of consumer fraud class actions, wherein plaintiff class action attorneys round up

potential clients to assert false advertising claims against companies which manufacture, distribute, market and sell consumer products.

14.     In many instances, plaintiff class action attorneys have induced people to purchase products they would not otherwise purchase, solely for the purpose of attempting to create a basis to threaten or actually file a putative class action lawsuit, claiming that the advertising claims for the particular product are false and misleading, and claiming that their client relied on the advertising claims for the product, and that he or she would never have purchased the product but for the alleged reliance on the product's advertising claims.

15.     Class action plaintiff attorneys threaten to file, and many times actually file, these types of lawsuits because they know that many companies will pay large sums of money to avoid the risks associated with a class action lawsuit, even where the allegations made by the plaintiffs' attorneys are completely without merit or any basis in fact.

16.     In other words, in all too many instances, class action lawsuits, or the threats of such a lawsuit, are used simply as a tool to extort money from companies who are unwilling to subject themselves to the significant financial and legal risks associated with class action litigation.

17.     Plaintiff class action attorneys have been particularly aggressive with regards to the nutritional supplement industry, and have turned threatening and filing false advertising putative class action lawsuits against nutritional supplement companies into a lucrative business.

18.     This particular lawsuit arises out of defamatory statements made by Defendants in connection with their threats to file a baseless class action lawsuit against Plaintiffs unless Plaintiffs agree to pay large sums of money to Defendants.

19.    On about September 23, 2013, Defendants sent a letter (the "Defamatory Letter") to Ms. Polizzi, wherein Defendants alleged that, in connection with manufacturing, distributing, advertising and selling the Products, Plaintiffs have violated the "Magnuson-Moss Warranty Act and other applicable laws."  A copy of the Defamatory Letter is attached hereto as Exhibit A.

20.    Defendants further alleged in the Defamatory Letter that certain advertising claims made for the Products are "false and misleading", and that the Products are "not, in fact, effective for weight control."  *See* Exhibit A.

21.    Defendants further alleged in the Defamatory Letter that their client, an individual name Ashley Brady ("Ms. Brady") had purchased the Products based on the representations on the packaging, labels, and in other marketing and advertising materials, and that she would not have purchased the Products had she known that they are "not safe or effective for weight loss." *Id.*

22.    The statements Defendants made the Products in the Defamatory Letter are false and defamatory.

23.    At the time Defendants made their false and defamatory statements Defendants had no factual basis on which to basis their allegations.   By way of example, Defendants claimed in the Defamatory Statement that the advertising claim which Plaintiffs make for Zantrex-3 that Zantrex-3 causes "546% more weight loss than the leading ephedra-based diet pill" is "false and misleading."  However, at the time Defendants made that statement Defendants did not even know what "leading ephedra-based diet pill" is referenced in the advertisement, and therefore could not know what the basis for the claim is, or whether the claim is in fact "false and misleading" as alleged in the Defamatory Letter.

24.     Upon information and belief, as of the date of this Complaint, Defendants still do not know what "leading ephedra-based diet pill" is referenced in the advertisement.

25.     Upon information and belief, Defendants have never tested any of the Products.

26.     Because have never tested any of the Products, Defendants do not know whether the Products are "not safe or effective for weight loss" as alleged in the Defamatory Letter.

27.     The allegation, either express or implied, in the Defamatory Letter that Ms. Brady purchased and used each of the Products is false.

28.     Upon information and belief, Ms. Brady never purchased the Fat Burner or the Power Crystals.[1]

29.     Accordingly, any express or implied allegation in the Defamatory Letter that Ms. Brady relied on the advertising claims for the Fat Burner or the Power Crystals is false.

30.     Additionally, any express or implied allegation in the Defamatory Letter that the Fat Burner or Power Crystals did not work for Ms. Brady is false.

31.     Defendants allege in the Defamatory Letter that "caffeine" is the "active" weight loss ingredient in the Products.

32.     Defendants' allegation that "caffeine" is the "active" weight loss ingredient in the Products is false.

33.     At the time Defendants made their statement that caffeine is the active weight loss ingredient in the Products, Defendants had no factual basis upon which to make that statement.

34.     Indeed, Defendants have never advertised or claimed that caffeine is the active weight loss ingredient in the Products.

---

[1] Plaintiffs do not concede that Ms. Brady purchased and used Zantrex-3, or, that if she did, that she relied on any of the Zantrex-3 advertising claims in purchasing the product.  As of the date of this complaint, Plaintiffs simply do not know whether Ms. Brady did or did not purchase Zantrex-3.

6

## The Products

### Zantrex-3

35.     Zantrex-3 is a nutritional supplement which is designed to promote energy and weight loss.

36.     The functional weight loss compound in Zantrex-3 is a proprietary blend of yerba maté, guarana and damiana (hereinafter "YGD").

37.     The combination of YGD contained in Zantrex-3 has been the subject of numerous clinical trials (including peer-reviewed, published, randomized, double-blind clinical trials) which trials demonstrate that YGD causes, *inter alia*, a reduction of caloric intake, a reduction of appetite, increased satiety, and significant weight loss.

38.     Zantrex-3 also contains a significant amount of caffeine.

39.     It is well accepted in the scientific community that caffeine is a stimulant and enhances energy.

40.     All of the advertising claims for Zantrex-3 referenced in the Defamatory Letter are true.

### Fat Burner

41.     Fat Burner is a nutritional supplement which is designed to promote energy and preferential fat loss.

42.     The active fat burning compound is Fat Burner is a compound known as "cissus".

43.     Cissus has been shown in a peer-reviewed, published, randomized, double-blind clinical trial to cause users to lose weight and to lose fat preferentially over losing muscle.

44.     Fat Burner also contains a significant amount of caffeine.

7

45.     It is well-accepted in the scientific community that caffeine is a stimulant and enhances energy.

46.     All of the advertising claims for Fat Burner referenced in the Defamatory Letter are true.

**Power Crystals**

47.     Power Crystals is a nutritional supplement which is designed to, among other things, promote energy, increased concentration, and reduce appetite.

48.     Power Crystals is a powder that can be mixed with water, which the user can then drink.

49.     Power Crystals contains the same clinically tested YGD compound that is contained in Zantrex-3.

50.     As with Zantrex-3 and Fat Burner, Power Crystals contains a significant amount of caffeine.

51.     It is well-accepted in the scientific community that caffeine is a stimulant and enhances energy.

52.     It is well-accepted in the scientific community that caffeine can enhance one's ability to concentrate.

53.     All of the advertising claims for Power Crystals referenced in the Defamatory Letter are true.

54.     Defendants' defamatory statements accuse Plaintiffs of dishonesty, engaging in unlawful and unethical business practices, and in engaging in business practices which are not the type of practices to be engaged in by legitimate, law-abiding businesses.

55.     Accordingly, Defendants' defamatory statements are defamatory per se.

8

56.     Pursuant to her endorsement contract with Zoller, Ms. Polizzi has demanded that Plaintiffs indemnify and defend her against any claims brought by Ms. Brady.

57.     Accordingly, Defendants' defamatory statements have caused actual damages to Plaintiffs.

58.     At the time defendants sent the Defamatory Letter to Ms. Pollizi, Defendants also sent the Defamatory Letter to Plaintiffs, in Utah.

59.     Accordingly, at the time Defendants sent the Defamatory Letter to Ms. Pollizi, Defendants, knew and intended that it would cause damages to Plaintiffs in Utah.

## FIRST CLAIM FOR RELIEF
### (Business Disparagement)

60.     The preceding allegations are incorporated herein.

61.     Defendants' Defamatory Letter was published to a third party – Ms. Pollizi.

62.     Defendants' Defamatory Letter is defamatory per se.

63.     Defendants' Defamatory Letter has caused injury to Plaintiffs' reputation, and has caused actual damages to Plaintiffs.

64.     Defendants' defamatory statements were made in reckless disregard for the truth, and were known to Defendants to be false when made.  In the alternative, Defendants were negligent or grossly negligent in making the defamatory statements.

65.     Defendants' made false and defamatory statements about Plaintiffs and the Products intentionally and with the purpose of injuring Plaintiffs' business, and in the hopes that the threat of a class action lawsuit would cause Plaintiffs to pay money to Defendants that Defendants are not entitled to receive.

66.     Defendants' defamatory statements were made without privilege.

67.     Defendants' defamatory statements were made with actual malice.

9

68.     By reason of Defendants' willful and malicious conduct that manifests a knowing and reckless indifference toward, and a disregard of, the rights of others, Plaintiffs are entitled to recover, in addition to their actual and consequential damages, punitive damages in an amount to be determined at trial.

## SECOND CLAIM FOR RELIEF
### (Defamation)

69.     The preceding allegations are incorporated herein.

70.     As set forth above, Defendants published unprivileged, false statements to a third party – Ms. Pollizi.

71.     These statements were intended to cause financial harm to Plaintiffs, and were intended to cause Plaintiffs to pay large sums of money due to the threat of a class action lawsuit.

72.     Plaintiffs have suffered harm as a result of Defendants' defamatory statements, including but limited to being required in indemnify and defend Ms. Pollizi from Defendants' baseless and false allegations, in an amount to be proven at trial.

73.     The defamatory statements at issue herein constitute defamation per se, such that Plaintiffs are entitled to recover general damages without proof of special damages.

74.     By reason of Defendants' willful and malicious conduct that manifests a knowing and reckless indifference toward, and a disregard of, the rights of others, Plaintiffs are entitled to recover, in addition to their actual and consequential damages, punitive damages in an amount to be determined at trial.

## THIRD CLAIM FOR RELIEF
### (Product Disparagement)

75.     The preceding allegations are incorporated herein.

76.     Defendants' Defamatory Letter was published to a third party – Ms. Pollizi.

77.     Defendants' Defamatory Letter contained disparaging and false statements about the Products.

78.     Defendants' defamatory statements were made in reckless disregard for the truth, and were known to Defendants to be false when made.

79.     Defendants' Defamatory Letter has caused damages to Plaintiffs, including damages associated with the demand by Ms. Pollizi to indemnify and defend her against Defendants' false accusations.

80.     Defendants' defamatory statements were made with malice.

81.     Defendants' made false and defamatory statements about Plaintiffs and the Products intentionally and with the purpose of injuring Plaintiffs' business, and in the hopes that the threat of a class action lawsuit would cause Plaintiffs to pay money to Defendants that Defendants are not entitled to receive.

82.     By reason of Defendants' willful and malicious conduct that manifests a knowing and reckless indifference toward, and a disregard of, the rights of others, Plaintiffs are entitled to recover, in addition to their actual and consequential damages, punitive damages in an amount to be determined at trial.

## AMOUNT AT ISSUE

83.     There is $50,000 or less at issue in this case, and therefore it should be subject to Tier 1 treatment under Utah R. Civ. P. 26.  The Plaintiffs will not seek more than $50,000 in total damages in this case, inclusive of fees and costs.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment as follows:

1.      For damages resulting from Defendants' defamatory statements, in an amount to be determined at trial;

2.      For an award of punitive damages in an amount to be determined at trial; and

3.      For an award of attorneys' fees, costs and prejudgment and post-judgment interest as allowed by applicable law; and

4.      For such other and further relief as the Court deems just, proper and equitable.

DATED this 11th day of November, 2013.

PRICE PARKINSON & KERR, PLLC


  /s/ Jason M. Kerr                                    
Jason M. Kerr
Attorneys for Plaintiff

EXHIBIT A

# BURSOR & FISHER
P.A.

888 SEVENTH AVENUE
NEW YORK, NY 10019
www.bursor.com

JOSEPH I. MARCHESE
Tel: 646.837.7410
Fax: 212.989.9163
jmarchese@bursor.com

September 23, 2013

**_Via Certified Mail - Return Receipt Requested_**

Basic Research, L.L.C.
5742 Harold Gatty Drive
Salt Lake City, UT 84116

Zoller Laboratories, L.L.C.
5742 Harold Gatty Drive
Salt Lake City, UT 84116

Nicole E. Polizzi aka "Snooki"
21 Wygant Road
Marlboro, NY 12542

Re:    Violation of Magnuson-Moss Warranty Act and other applicable laws

This letter serves as a notice and demand for corrective action on behalf of our client, Ashley Brady, and all other persons similarly situated, arising from breaches of warranty under the Magnuson-Moss Warranty Act. This letter also serves as notice pursuant to N.Y. U.C.C. LAW § 2--607(3)(a) concerning the breaches of express and implied warranties described herein.

You have participated in the marketing and sale of Zantrex-3, Zantrex-3 Fat Burner, and Zantrex-3 Power Crystals (collectively, "Zantrex") as over-the-counter weight loss drugs. The labels for Zantrex claim it is safe and effective for "rapid weight loss," provides "extreme energy," delivers "546% more weight loss than the leading ephedra-based diet pill," and causes "reduced appetite," "increased concentration," "increased alertness," and "increased performance." Each of these representations is false and misleading. Zantrex is not, in fact, effective for weight control.

Furthermore, with respect to caffeine, the active ingredient, the FDA has determined that "there are inadequate data to establish the general recognition of the safety and effectiveness" of caffeine for the specified use of weight control. *See* 21 C.F.R. § 310.545(20).

Ms. Brady purchased Zantrex based on representations on the package, label, and in other marketing and advertising materials which state, among other things, that the product was safe and effective for weight loss. She would not have purchased Zantrex if she had known that it is not safe or effective for weight loss.

BURSOR&FISHER                                                                PAGE 2

Ms. Brady is acting on behalf of a class defined as all persons in the United States who purchased Zantrex, and a subclass of persons who purchased Zantrex in the State of New York.

To cure these defects, we demand that you (1) cease and desist from further sales of Zantrex; (2) issue an immediate recall of Zantrex; (3) remove the false and misleading claims from Zantrex's label; (4) cease making false and misleading claims in Zantrex's advertising; and (5) make full restitution to all purchasers of Zantrex of all purchase money obtained from sales thereof.

We further demand that you preserve all documents and other evidence which refer or relate to any of the above-described practices including, but not limited to, the following:

1.      All documents concerning the design, development, and/or testing of Zantrex;

2.      All documents concerning the advertisement, marketing, or sale of Zantrex;

3.      All documents concerning communications with any retailer involved in the marketing or sale of Zantrex;

4.      All documents concerning communications with purchasers of Zantrex, including but not limited to customer complaints related to its failure to reduce weight or body fat; and

5.      All documents concerning the total revenue derived from sales of Zantrex in the United States.

We are willing to negotiate to attempt to resolve the demands asserted in this letter. If you wish to enter into such discussions, please contact me immediately. If I do not hear from you promptly, I will conclude that you are not interested in resolving this dispute short of litigation.

If you contend that any statement in this letter is inaccurate in any respect, please provide us with your contentions and supporting documents promptly.

Very truly yours,

Joseph I. Marchese

**EXHIBIT C**



UNITED STATES OF AMERICA
## FEDERAL TRADE COMMISSION
WASHINGTON, D.C. 20580

Bureau of Consumer Protection
Division of Enforcement

Lemuel Dowdy
Attorney

Direct Dial:
(202) 326-2981

Fax:
(202) 326-2559

November 2, 2007

**VIA EMAIL AND U.S. MAIL**
Linda A. Goldstein, Esq.
Manatt, Phelps & Phillips, LLP
7 Times Square
New York, New York 10036

Re: *In the Matter of Basic Research, LLC, et al.,* FTC Docket No. 9318

We have completed our review of Respondents' compliance report and supplemental supporting materials and determined that Respondents have violated two provisions of the Commission's Order issued on June 19, 2006. The purpose of this letter is to set forth the claims that violate Paragraphs II and III of the Order, present our analysis of Respondents' purported substantiation for the claims, and inform Respondents that they must promptly revise their advertisements to comply with the Order.[1]

### I. Introduction

This letter focuses primarily on the deficiencies of the Andersen/Fogh[2] and Antonio[3] studies, upon which Respondents rely most heavily as support for their products claims. Before we turn to those studies, however, we first address three of Respondents' other often-mentioned

---

[1]    We did not review or seek Respondents' substantiation for all of the Respondents' advertising claims covered by the Order. The claims identified here do not constitute an exhaustive list of all statements by Basic Research that may violate the Order.

[2]    T. Andersen and J. Fogh, *Weight Loss and Delayed Gastric Emptying Following a South American Herbal Preparation in Overweight Patients*, 14 Journal of Human Nutrition and Dietetics 3, 243–50 (2001).

[3]    J. Antonio, et al., *Effects of a Standardized Guggulsterone Phosphate Supplement On Body Composition in Overweight Adults: A Pilot Study*, 50 Current Therapeutic Research 4, 220-27 (1999).

Linda A. Goldstein, Esq.
November 2, 2007
Page 2

substantiation materials, which we have determined do not constitute competent and reliable
scientific evidence. First, the Consumer Study[4] does not constitute such evidence in support of
Respondents' weight loss claims for three primary reasons: (1) the study only lasted 28 days; (2)
the study required the subjects to weigh and measure themselves and report the data to the
researchers; and (3) by the fourth week of the study, only 44% of the subjects followed the
researchers' dosage instructions.[5]

Second, Respondents claim that consumer testimonials provide a reasonable basis for
their product claims. It is clear from FTC case law, however, that testimonials do not constitute
competent and reliable scientific evidence. *See, e.g., Removatron Int'l Corp.*, 111 F.T.C. 206,
234 (1988) ("It is well settled that testimony of satisfied users of a product is of little evidentiary
value in determining the adequacy of substantiation for an advertising claim of effectiveness of a
product or device."), *aff'd*, 884 F.2d 1489 (1st Cir. 1989).

Third, the ghrelin study conducted by Daniel Mowrey and Natalie Chevreau[6] is not
competent and reliable scientific evidence because it involved only five subjects in an
uncontrolled setting.

## II. Violations of Paragraph II of the Order

Paragraph II of the Order prohibits unsubstantiated representations about the weight loss
benefits of any food, drug or dietary supplement. In violation of Paragraph II of the Order, Basic
Research represents the weight loss benefits of several products without possessing and relying
upon competent and reliable scientific evidence. The Andersen/Fogh study does not constitute
competent and reliable scientific evidence to support claims A through C. Indeed, the fact that
the article reporting the study does not contain a statistical analysis calls into question the

---

[4]     C.H.S. Ruxton, et al., *Effects of an Over-the-Counter Herbal Weight-Management
Product (Zotrim) on Weight and Waist Circumference in a Sample of Overweight Women: a
Consumer Study*, 35 Journal of Nutrition & Food Science 5, 243-50 (2005).

[5]     We note that the expert panel advising the authors of the meta-analysis of
ephedrine weight-loss studies (the Rand Report) determined that treatment durations shorter than
eight weeks were insufficient to assess weight loss. *Ephedra and Ephedrine for Weight Loss and
Athletic Performance Enhancement: Clinical Efficacy and Side Effects*, Evidence
Report/Technology Assessment No. 76 (Prepared by the Southern California Evidence-Based
Practice Center, RAND, Paul Shekelle, MD, PhD, Task Order Director, under contract with HHS
Agency for Healthcare Research and Quality) (Feb. 2003).

[6]     "Effect of the IPT Combination and Methylxanthines on Plasma Ghrelin Levels in
Women Subjects." (BR0004424 to BR0004430).

Linda A. Goldstein, Esq.
November 2, 2007
Page 3

reliability of the study as support for any weight loss claim.[7]  Similarly, miscellaneous other materials Respondents submitted to support claim D do not constitute competent and reliable scientific evidence substantiating that claim.  We discuss the unsubstantiated claims, which are implied claims conveyed by Respondents' advertising, and the inadequacy of Respondents' substantiation in more detail below.[8]

     A.    **Unsubstantiated Claim**:  **Akavar allows users to eat unlimited amounts of food and still lose weight.**[9]

     **Explanation of Violation**:  Advertisements for Akavar represent that users can eat all they want and still lose weight, which conveys the implied claim that users can eat unlimited amounts of food and still lose weight.  The Andersen/Fogh study does not constitute competent and reliable scientific evidence that users taking Akavar can eat unlimited amounts of food and still lose weight because the researchers did not monitor the caloric intake of those subjects who took the YGD compound and lost weight.  In fact, the authors proposed further

---

   [7]      While our primary concerns about the Andersen/Fogh study are set forth in the body of the letter, we have some additional reservations about Respondents' reliance on that study.  First, the length of the study, 45 days, may be insufficient to assess weight loss, as noted in footnote 5, above.  Second, the preparations of yerba mate, guarana, and damiana used in the study may differ from those in Respondents' products, even though the amount of the ingredients may be the same in both.  The Dietary Supplement guidelines note (at 18) that marketers should not rely solely on clinical trials using different extract preparations as competent and reliable evidence of efficacy.  Different preparations of the same plant may contain widely divergent amounts of active compounds.  The part of the plant used and the method of preparation (which can range from powdering dried crude herbs to sophisticated extraction techniques using a variety of solvents) can result in very different end products.  Third, Respondents' inclusion of ingredients in addition to the YGD compound, particularly DHEA, which is an endogenous hormone and a precursor to male and female sex hormones, may cause additional effects that cannot be attributed to YGD alone.

   [8]      We note that claims A through C are "Red Flag" claims.  *See* the FTC's publication "Red Flag Bogus Weight Loss Claims" ("Red Flags") located at http://www.ftc.gov/bcp/conline/pubs/buspubs/redflag.pdf.  It is staff's view that such claims are scientifically infeasible at the current time.  Nonetheless, this letter assesses the substantiation materials Respondents rely upon most heavily.

   [9]      Most of the Akavar ads contain this claim: "EAT ALL YOU WANT AND STILL LOSE WEIGHT." *See, e.g.,* 30- and 60-second television commercials; www.dynakorpharmacal.com (last visited October 31, 2007); www.akavardirect.com (last visited October 31, 2007); BR0004968; BR0004972.

Linda A. Goldstein, Esq.
November 2, 2007
Page 4

research to understand the effect, if any, of the YGD compound on appetite and caloric intake.

If the respondents could substantiate a claim that the product reduces appetite, a claim that people using the product can eat what they want would not necessarily violate the Order so long as the advertising discloses clearly and conspicuously that users will not want to eat as much food as before they started using the product. As explained above, however, the Respondents have not substantiated a claim that the product reduces appetite. Even if the Respondents could substantiate such a claim, we do not believe the Akavar advertising discloses clearly and conspicuously that the product will cause people to want to eat less food. For example, in the 30-second commercial, the words "EAT ALL YOU WANT AND STILL LOSE WEIGHT," are repeated aloud and on screen. However, the closest the commercial comes to suggesting that people will want to eat less food is the phrase "Caloric Restricting Compound," which appears on screen twice, but is not said aloud or explained. Similarly, Akavar's print ads include the claim "AUTOMATIC CALORIC RESTRICTION,"[10] accompanied by the statement that "Study participants were specifically told not to alter their eating habits and they still lost weight." These vague references to caloric restriction do not convey to consumers that Akavar will cause them to want to eat less food. Indeed, they may suggest that such restriction is not necessary. Appetite is not the only factor in food intake. If consumers interpret not altering their eating habits to mean consuming the same quantity of food, weight loss would not be expected to occur.

**B.      Unsubstantiated Claim**: Akavar causes substantial weight loss in all users.[11]

**Explanation of Violation**: Respondents' Akavar ads imply that all Akavar users will experience substantial weight loss. However, no weight loss product causes weight loss in all users. Akavar websites (but not Akavar television commercials) do contain a statement that no diet pill can work for everyone, but this statement is completely overwhelmed by more prominent claims touting 100% success.

**C.      Unsubstantiated Claim**: Estrin-D causes permanent weight loss.[12]

_____

[10]      *See, e.g.,* BR0004972.

[11]      One website selling Akavar states: "YOU WILL NOT FAIL THIS TIME" and "FACT: TESTS PROVE VIRTUALLY 100% SUCCESS!" That's right. While no diet pill can possibly work for everybody (that's why there's a money-back guarantee) scientific documentation has confirmed that virtually everyone in the study who used Akavar's active compound (23 out of 24 participants, to be exact) lost weight." *See* www.akavardirect.com (last visited October 31, 2007).

[12]      Marketing materials for Estrin-D state: "In other words, the active ingredients in Estrin-D caused easy, automatic, permanent weight loss without calorie-counting and without

Linda A. Goldstein, Esq.
November 2, 2007
Page 5

       **Explanation of Violation**: The Andersen/Fogh study does not constitute competent and reliable scientific evidence to support the claims that customers taking Estrin-D will experience permanent weight loss for two reasons. First, the longest segment of the study was 12 months, which is not long enough to support a "permanent" weight loss claim. Second, during the 12-month segment, 22 subjects took the YGD compound in an uncontrolled setting. As a result, the study does not constitute competent and reliable scientific evidence substantiating this claim.

   **D.**    **Unsubstantiated Claim**: Relacore causes a reduction in abdominal fat.[13]

       **Explanation of Violation**: This claim is not supported by competent and reliable scientific evidence. Respondents' substantiation materials do not include studies of Relacore itself or, with one inconsequential exception, any studies showing that any of the ingredients in Relacore cause a reduction in abdominal fat.[14] Instead, Respondents' substantiation rests on the theoretical chain of reasoning that the purported mood elevating or stress reducing effects of the ingredients in Relacore reduces cortisol levels, which, in turn, reduces abdominal fat. (*See* July 23rd letter at 21).

---

diet rebound." *See, e.g.,* www.thebodyforum.com/?p=EstrinD (last visited October 31, 2007); www.estrin-d.com/estrin-d-faq3.php (last visited October 31, 2007); BR0000441.

[13]     Relacore's product carton states: "Relacore's natural anti-stress, mood elevating formula can help alter the underlying stress-related causes of excess belly fat. . . leaving you happier, full of energy, and with that flat, youthful tummy you thought you'd never see again" Other ads state: But now there's Relacore. Relacore helps control cortisol and helps us lose stubborn belly fat. . . FAST!" (BR0000748) Similarly, the homepage of www.relacore.com (last viewed October 31, 2007) states: "Can an all-natural 'feel good pill' help shrink your 'Belly FAT?' The answer may surprise you. (Click here to find out more.)" When consumers click, the following language appears: "But now you can beat stress-induced belly fat with Relacore, the breakthrough all-natural anti-anxiety, mood elevating pill that, in conjunction with a sensible diet and exercise program, helps control stress-induced cortisol production, thereby helping reduce belly fat."

[14]     Respondents have submitted at least one study suggesting that DHEA may reduce abdominal fat in elderly adults. It is clear from a 2003 review that, at that time, there was a major conflict among DHEA studies as to whether DHEA causes changes in body composition. *See* K. Ketan, et al., *Dehydroepiandrosterone: Is There A Role for Replacement?* 78 Mayo Clin. Proc., 1257-1273 (2003). In addition, a recent two-year study found no differences in body composition between elderly adults taking DHEA and those receiving a placebo. *See* K.S. Nair et al., *DHEA in Elderly Women and DHEA or Testosterone in Elderly Men,* 355 New Engl. J. Med. 16, 1647-59 (2006).

Linda A. Goldstein, Esq.
November 2, 2007
Page 6

Respondents have not, however, presented competent and reliable scientific evidence that
Relacore, even if it does elevate mood or reduce stress, also reduces cortisol and belly fat. It is
not clear that reducing stress or elevating mood leads to less cortisol and less abdominal fat.[15]
For example, it is well known that many anti-depressant prescription drugs actually cause weight
gain.[16]

In addition, although some studies suggest that elevated cortisol levels are associated with
abdominal fat, a cause and effect relationship has not been established conclusively. For
example, an article reporting a study on cortisol levels in middle-aged and older men states: "It
remains unknown, however, whether excess cortisol secretion is primarily a cause, or is rather a
consequence of human obesity itself.[17] In addition, Dr. Malcolm Low, MD, Ph.D., senior
scientist and Associate Director, Center for the Study of Weight Regulation and Associated
Disorders, Oregon Health & Science University, Portland, has been quoted as stating: "For the
average person who has gained a bit too much weight, the problem isn't that he or she makes too
much cortisol. It is probably that this person eats too much fast food and doesn't exercise. Even
if such people have elevated cortisol, it is because they have excess body fat, not because there
was too much cortisol to begin with. The medical condition of excess cortisol is unusual."[18]

In summary, the Relacore weight loss claims are not supported by competent and reliable
scientific evidence because Respondents' substantiation materials do not demonstrate that
elevating mood or reducing stress (assuming Relacore produces such effects) necessarily reduces
a person's levels of cortisol or abdominal fat. In addition, Respondents have not demonstrated
that stress-related increases in cortisol levels lead to an increase in abdominal fat.

---

[15]     Indeed, one study Respondents submitted states: "It is not yet clear whether
measures which relieve chronic psychological stress can be broadly useful for controlling visceral
obesity . . ." M.F. McCarty *Modulation of adipocyte lipoprotein lipase expression as a strategy
for preventing or treating visceral obesity*. (BR0009727, BR0009731).

[16]     *See* M. Fava, *Weight Gain and Antidepressants*, 61 J. Clin. Psychiatry Supp. 11,
37-41 (2000).

[17]     G. Travison et al., *Cortisol levels and measures of body composition in middle-
aged and older men*, 67 Clinical Endocrinology, 71-77 (2007).

[18]     *See* article "Stress Hormone: No Link to Obesity?" located at
http://www.medicinenet.com/script/main/art.asp?articlekey=57726 (last visited October 31,
2007).

Linda A. Goldstein, Esq.
November 2, 2007
Page 7

### III.    Violations of Part III of the Order

Part III of the Order prohibits misrepresentations of the existence, contents, validity, results, conclusions, or interpretations of any test, study, or research.  We have determined that certain implied claims in Respondents' advertisements relating to the Andersen/Fogh study and the Antonio study violate Part III.  We discuss the claims and their proposed substantiation below.

**A.    Misrepresentation**:  Respondents' advertisements for Akavar misrepresent the Andersen/Fogh study by claiming that this test proves that Akavar causes weight loss.[19]

**Explanation of Violation**:  This claim misrepresents the conclusions of the Anderson/Fogh study.  Instead of concluding that the study proves that the tested compound causes weight loss, the article reporting the Andersen/Fogh study states that the study's results should be considered preliminary:  "[T]his herbal preparation may prove to be an additional new method for facilitating weight loss.  Further clinical studies with dietetic monitoring of energy intake, dietary quality, satiety ratings, body weight and body composition are now indicated . . . ."

**B.    Misrepresentation**:  Respondents' advertisements for Akavar misrepresent the Andersen/Fogh study by claiming that the one-year portion of the study was randomized and controlled.[20]

---

[19]    A website selling Akavar states: "FACT: TESTS PROVE VIRTUALLY 100% SUCCESS . . . In a controlled, randomized clinical trial (the only type of proof accepted by the both [sic] scientific and medical communities) doctors tested a group of overweight patients. And among those that took the active, patented Akavar 20/50 compound, 23 out of 24 people lost a substantial amount of weight . . . In other words, Akavar 20/50 caused automatic weight loss without calorie counting and with diet rebound." *See* www.dynakorpharmacal.com (last visited October 31, 2007).

[20]    A website selling Akavar states: "In a controlled randomized clinical trial (the only type of proof accepted by the both [sic] scientific and medical communities) doctors tested a group of overweight patients.  And among those that took the active, patented Akavar compound, 23 out of 24 people lost a substantial amount of weight. But there's more!  Not one of the subjects who continued taking the active Akavar weight-loss compound for a period of one full year experienced rebound weight gain.  Not one!  In other words Akavar caused easy, automatic weight loss without calorie counting and without diet rebound." *See* www.dynakorpharmacal.com (last visited October 31, 2007).

Linda A. Goldstein, Esq.
November 2, 2007
Page 8

**Explanation of Violation**: In fact, the one-year portion of the study was not randomized or controlled.

C.     **Misrepresentation**: Respondents' advertisements for Estrin-D and Zotrin misrepresent the results of the Andersen/Fogh study by claiming subjects receiving the YGD compound lost weight because they reduced their caloric intake.[21]

**Explanation of Violation**: In fact, however, the Andersen/Fogh study did not establish the mechanism leading to the weight loss in the group taking the YGD compound. Indeed, as already discussed, the authors proposed further research to understand the effect, if any, of the YGD compound on appetite and caloric intake.

D.     **Misrepresentation**: Respondents' advertisements for Estrin-D misrepresent the Andersen/Fogh study by claiming that menopausal women who received the YGD compound lost more weight than menopausal women who received a placebo.[22]

**Explanation of Violation**: This claim misrepresents the Andersen/Fogh study because the study as reported does not identify the ages of the individual female subjects, or which of the them were menopausal. Therefore, Dr. Mowrey must have drawn his own conclusions as to which women in the study were menopausal based solely on their age when constituting his "subgroup of 15 perimenopausal and menopausal women." Age is not an accurate method of identifying menopausal women because women do not reach menopause at the same age. Generally speaking, most North American women reach menopause sometime between the ages of 45 and 55, but menopause can occur as early as age 40 or as late as age 60. Additionally, menopause can be induced surgically (by removing ovaries) at any age.

E.     **Misrepresentation**: Respondents' advertisements for Estrin-D misrepresent the results of the Andersen/Fogh study by claiming that the study proves that the YGD compound

---

[21]    An Estrin-D ad states: "In other words, the active ingredients in Estrin-D reduced caloric intake automatically." www.estrin-d.com/estrin-d-faq3.php (last visited October 31, 2007).

    The Zotrin product package states: "Reduces daily caloric intake automatically." (BR0000924-25).

[22]    "Relevant to this summary is an analysis of the weight change of the subgroup of 15 perimenopausal and menopausal women . . . . Seven of these women were randomly assigned to receive the treatment that consisted of . . . . Eight of these women . . . took capsules containing a placebo. . . . At the end of the 45 days, the YGD-treated group lost an average of 3.16 Kilos (8 lbs.) whereas the placebo group lost only an average of 0.16 kg (0.3 lbs)." http://www.estrin-d.com/estrin-d-studies.php (Last visited October 31, 2007).

Linda A. Goldstein, Esq.
November 2, 2007
Page 9

causes permanent weight loss or causes users to maintain weight loss for one year.[23]

      **Explanation of Violation**:  As discussed above, the one-year portion of the Andersen/Fogh study was uncontrolled.  Therefore, any claim that this portion of the study represents proof of permanent weight loss or weight maintenance is false.

      **F.**    **Misrepresentation**:  Respondents' advertisements for Leptoprin SF misrepresent the Antonio study by claiming that the study represents proof of weight loss.[24]  Respondents' advertisements for Stim-Free and ProVactin contain similar misrepresentations.[25]

      **Explanation of Violation**:  There are several problems with the Antonio study. First, there were only six subjects in each of the three study groups.  Most scientists agree that study populations of this size are too small to produce reliable results.[26]  The problem with the small study group size was compounded by large differences between the experimental group and the placebo group with respect to age, percentage of fat at baseline, and fat mass at baseline.

      Second, the difference in overall weight loss between the group taking guggulsterone phosphate and the control and placebo groups was not statistically significant.  The study's abstract specifically states that between-group differences in weight loss were not statistically significant.  Although Respondents assert that Dr. Mowrey found evidence to the contrary, we do

---

[23]    *See* footnote 14, above.

[24]    A website selling Leptoprin-SF states: "After Six Weeks, the Study Results Were Independently Reviewed and Verified.  The Leptoprin-SF group experienced a significant decrease in overall body weight — an incredible 830% greater than the group who participated in the diet and exercise program alone!" and "Clinical Studies Don't Lie.  In a recent clinical trial, subjects who were given the active Leptoprin-SF compound (in conjunction with modest caloric restriction and exercise) experienced eleven times (1100%) more weight loss and 63% more fat loss than those on diet and exercise alone."  *See* www.leptoprin.com (Last visited August 13, 2007); BR0000557-559.

[25]    The Stim-Free and ProVactin packages state: "What else does this scientifically validated study clinical trial confirm?  Simply this: there's a 100% stimulant-free, clinically proven way to lose excess pounds of spongy fat and flab."  (BR0000343,  BR0000671).

[26]    *See* L.M. Hsu, *Random Sampling, Randomization, and Equivalence of Contrasted Groups in Psychotherapy Outcome Research*, 57 Journal of Consulting and Clinical Psychology 1, 131-137 (1989).  *See also* Stephen D. Simon, Statistical Evidence in Medical — Trials What do the data really tell us? 4 (Oxford University Press 2006).

Linda A. Goldstein, Esq.
November 2, 2007
Page 10

not believe that Dr. Mowrey's information is reliable. The researchers who conducted the study published a correction to state that the difference between the guggulsterone phosphate group and the other groups was statistically significant with respect to fat mass, but the correction did not change the statement about the lack of significant between-group differences in weight loss.

Apparently, Dr. Mowrey relies on a statement in the U.S. Patent application for the guggulsterone phosphate compound claiming that there was a significant between-group difference in weight loss. This statement is not reliable. It is part of a one-paragraph summary of the study that appears in an application dated October 27, 1998, months before the study was reported in April 1999 and corrected in November 1999.

Finally, we disagree with the statement in your June 21st letter that a Utah federal district court judge made favorable statements about the Antonio study in his "Findings of Fact and Conclusions of Law and Order" issued in *Basic Research, LLC v. Cytodyne Technologies, Inc.* In fact, the judge referred to a study of an ephedrine product that was published in the April, 2000 issue of Current Therapeutic Research. As you know, the Antonio study appeared in that publication's April, 1999 issue.

## IV.    Conclusion

In closing, we believe that the Respondents have committed, and continue to commit, serious violations of the Order. We strongly encourage Respondents to take steps to ensure that their current advertising complies with the Order. We will give such steps appropriate weight in assessing whether to recommend enforcement action and the remedies the Commission should seek in any such action. At the same time, Respondents should recognize that they have been under a legal duty to comply with the Order since June 2006, and that compliance at this point will not necessarily avoid an enforcement action. Please inform us, within two weeks of the date of this letter, of the steps Respondents will take to comply with the Order. The opinions expressed in this letter are those of the staff, and do not necessarily reflect the views of the Commission or of any Commissioner.

Sincerely,

Lemuel Dowdy